# REDACTED OPINION

# In the United States Court of Federal Claims

No. 13-20C
Filed: April 30, 2013
Redacted Version Issued for Publication: May 22, 2013[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | |
| CADDELL CONSTRUCTION CO., INC., | * | Post-Award Bid Protest; |
| | * | Cross-Motions for Judgment |
| Plaintiff, | * | on the Administrative Record; |
| v. | * | Standing; Timeliness; |
| | * | Standard of Review; Pre- |
| UNITED STATES, | * | qualification; Percy |
| | * | Amendment; Best-Value |
| Defendant, | * | Trade-Off Analysis; Injunctive |
| | * | Relief; Bid Preparation and |
| DESBUILD INCORPORATED–REC | * | Proposal Costs. |
| INTERNATIONAL JOINT VENTURE, | * | |
| | * | |
| Defendant- Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * | | |

**Dirk D. Haire**, Fox Rothschild, LLP, Washington, D.C., for plaintiff. With him was **Alexa Santora**, Fox Rothschild, LLP, Washington, D.C.

**Shari A. Rose**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Martin F. Hockey, Jr.**, Assistant Director, **Jeanne F. Davidson**, Director, Commercial Litigation Branch and **Stuart F. Delery**, Principal Deputy Assistant Attorney General, Civil Division.

**Lawrence M. Prosen**, Thomas Hine, LLP, Washington, D.C., for intervenor.

## O P I N I O N

### HORN, J.

Plaintiff Caddell Construction Co., Inc. (Caddell) filed a post-award bid protest in this court on January 10, 2013, challenging the United States Department of State's

---

[1] This opinion was issued under seal on April 30, 2013. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with the redactions that the parties proposed in response to the court's request. Where words have been redacted, it is reflected with the following notation: "[redacted]."

award of a $156 million contract to intervenor Desbuild Incorporated-REC International Joint Venture (Desbuild-REC) for the construction of a new annex building at the United States Embassy in Moscow, Russia, pursuant to Solicitation No. SAQMMA-12-R-0117 (the Solicitation).  Plaintiff alleges that, but for defendant's arbitrary and capricious evaluation of the proposals and violation of statutes and regulations in awarding the construction project to Desbuild-REC, Caddell would have been evaluated as the lowest-priced, technically acceptable offeror.  Plaintiff seeks permanent injunctive relief, as well as damages, including bid preparation and proposal costs.  The parties have filed, and fully briefed, cross-motions for judgment on the administrative record, and oral argument was held.

## FINDINGS OF FACT

On January 31, 2012, defendant issued a "Notice of Solicitation of Submissions for Construction of the New Annex Office Building at U.S. Embassy in Moscow, Russia," (Pre-qualification Notice)[2] via a posting on FedBizOpps.[3]  The Pre-qualification Notice explained that defendant was requesting submissions to pre-qualify offerors to construct an annex office building within the United States Embassy compound in Moscow.  The Pre-qualification Notice indicated that "[t]he project solicitation will consist of two phases:" 1) Pre-Qualification of Offerors, and 2) Requests for Proposals from Pre-Qualified Offerors.  In Phase I, defendant would determine which offerors pre-qualified for the contract, then, those firms which had pre-qualified would be invited to submit a Phase II proposal.  The Pre-qualification Notice also stated:

> DOS [Department of State] anticipates that a tradeoff process (see FAR 15.101-1) is in the best interest of the Government.  The Government will consider award to other than the lowest price offer or other than the highest technically rated offer. DOS anticipates that evaluation of technical and past performance considerations will play a significant role in the selection process.

Defendant's January 31, 2012 posting on FedBizOpps listed Charles G. Krips[4] as defendant's "Primary Point of Contact" for the procurement.  The Pre-qualification

---

[2] Plaintiff refers to this document as the "Solicitation" and defendant and intervenor refer to it interchangeably throughout their briefs as the "Solicitation," "Prequalification Solicitation," and "Prequalification Notice."  The court refers to this document as the "Pre-qualification Notice" to distinguish between the Notice and the Solicitation, No. SMQMMA-12-R-0117, which was issued after Phase I of the procurement was completed.

[3] FedBizOpps is the online database of all federal government contracting opportunities over $25,000.00 in value.  See Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 76 (2006), recons. in part, 75 Fed. Cl. 406 (2007).

[4] Defendant refers to Mr. Krips as the "Contract Specialist" for the Moscow project.  On various documents in the record which Mr. Krips authored and signed, he listed his title

2

Notice instructed offerors to mail their Phase I submissions to "U.S. Department of State: Attn: Charles G. Krips," and to email Mr. Krips any requests for clarification.

The Pre-qualification Notice stated that three technical evaluation factors would be considered in Phase I: Factor 1: Joint Venture Agreement/Signed Statement of JV [Joint Venture] Intent and Description of Partnership (if applicable), Factor 2: Technical Project Experience and Past Performance, and Factor 3: Business Management Plan and Organization. Factor 2 was further broken down into two subfactors: Subfactor 2A: Technical Project Experience, and Subfactor 2B: Past Performance. Each factor was to be "evaluated on a pass/fail basis." An offeror that received a failing mark on any of the three technical factors would be disqualified from the competition, and would not be allowed to submit a Phase II offer or receive the contract award. The Pre-qualification Notice explained under Submission Requirements that offerors were responsible for submitting sufficient documentation for defendant to evaluate the offer under each technical factor, stating: "Only the information in the submission and any additional information obtained concerning past performance will be considered during the evaluation of the Offeror."[5]

Under Factor 1, Joint Venture Agreement/Signed Statement of JV Intent and Description of Partnership, offerors already organized as joint ventures, or who planned to form a joint venture for the project, were instructed to submit either a Joint Venture Agreement or a Statement of Intent to form a joint venture. Joint venture offerors were asked to "[d]escribe the relationship of the JV parties," "[i]dentify each JV party's role," and "[i]dentify the type and percentage of work assigned to each JV party." The Pre-qualification Notice stated that, for Factor 1: "**If the offeror is organized as a Joint Venture, DOS will evaluate whether the roles and responsibilities of the JV parties have been adequately described.**" (emphasis in original). The Pre-qualification Notice further indicated that receiving a passing score on Factor 1, Joint Venture Agreement/Signed Statement of JV Intent and Description of Partnership, was required, if applicable, in order for defendant to review the remainder of the offeror's Phase I submission.

According to the Pre-qualification Notice, Subfactor 2A, Technical Project Experience, "is intended to evaluate the technical project experience of the Offeror and its JV partners, if applicable." Paragraph 2A.2 of the Pre-qualification Notice defined the

as "Senior Contracting Administrator, Bureau of Overseas Buildings Operations, Office of Special Projects Coordination." Mr. Krips seems to have been the main point of contact for offerors throughout the procurement process, as well as the official within the Department of State who coordinated the evaluation of offerors' Phase I and Phase II submissions. Mr. Krips also made a statement as part of the GAO proceedings, which as discussed below, defendant argues the court should consider in ruling on the above captioned protest.

[5] Under Subfactor 2B, Past Performance, the Solicitation stated: "DOS may gather information from other sources to assist in evaluating the quality of the Offeror's past performance."

term "relevant projects" as "those projects similar in scope, complexity, and dollar value (USD), in that order of importance." Paragraph 2A.3 instructed offerors to "[s]ubmit three examples of relevant projects, either on-going or completed within the past five years, demonstrating the Offeror's technical capabilities necessary to perform the Project." (emphasis in original). In Paragraph 2A.4, offerors organized as a Joint Venture were instructed to "submit, for each partner, at least one, but no more than two, example of projects that are relevant to demonstrate technical project experience for the partners' proposed role in the Project. Projects may be on-going or completed within the past five years." (emphasis in original). According to the Pre-qualification Notice, because of applicable limits on subcontracting, project examples were intended to "demonstrate the Offeror's ability to self-perform at least 30-50% of the value of each project example," and, therefore, "[p]roject examples in which the Offeror only acted as a General Contractor or did not self-perform at least 30% of the work will not be considered relevant." The Pre-qualification Notice also stated: "**DOS will evaluate the Offeror's technical project experience in executing relevant projects. For Offerors who do not have individual projects representative of the project scope and complexity, DOS will evaluate the technical project experience demonstrated by the combined project examples.**" (emphasis in original).

Under Subfactor 2B, Past Performance, offerors were instructed, for any project in which they had been involved over the past five years, to identify and explain any of the following problems:

2B.2.1 Been terminated for default;
2B.2.2 Been issued a cure notice;
2B.2.3 Been issued a show cause notice;
2B.2.4 Been assessed liquidated damages;
2B.2.5 Had its performance and payment bond surety or bank notified that the contractor was not fulfilling its contract obligations;
2B.2.6 Had its performance evaluated as unsatisfactory or unacceptable[.]

In addition, for any project listed under Subfactor 2A, Technical Project Experience, offerors were asked to identify any other type of performance problems. Offerors were also required to have three previous clients fill out "Past Performance Questionnaire" forms and to submit those three forms as references. The Pre-qualification Notice further indicated that defendant would gather information internally regarding offerors' compliance with Department of State criteria on previous projects. The Pre-qualification Notice stated that for Subfactor 2B, Past Performance:

**DOS will evaluate the quality of the Offeror's past performance-based on information submitted for Factors 2B.1. DOS will evaluate the Offeror's record of compliance with Industrial Security and Construction Security requirements for Factor 2B.5 [Compliance with DOS Criteria] if such experience exists. DOS will evaluate the Offeror's record of project completion and close-out, its approach to problem and change resolution, and its responsiveness to issues**

4

**and problems raised by OBO [Bureau of Overseas Building Operations] for Factor 2B.5 if applicable. Additionally, DOS may gather information from other sources to assist in evaluating the quality of the Offeror's past performance.**

(emphasis in original).

With regard to Factor 3, Business Management Plan and Organization, offerors were told to "provide a brief description of its business management plan for this project that addresses offeror's methodology for decision making, personnel management, team approach, quality assurance, etc. in the execution of the contract scope, schedule, and cost." In addition, offerors were instructed to "provide an organizational chart that clearly depicts organizational structure and describes the relationship of key positions for construction activities (including all consultants and QC [Quality Control] personnel)." Offerors organized as joint ventures were to "clearly indicate the allocation of authority within the JV" in their business plan. The Pre-qualification Notice stated: "**DOS will evaluate whether the Offeror's proposed business management plan and organization clearly demonstrate a comprehensive and effective approach for management and coordination of decision making, project personnel and development, and control of schedules and costs for this project.**" (emphasis in original).

The Pre-qualification Notice also indicated that Section 11 of the Foreign Service Buildings Act of 1926, codified at 22 U.S.C. § 302 (Percy Amendment), applied to the project. The Pre-qualification Notice stated:

> Section 11 of the Foreign Service Buildings Act of 1926, as amended, *(22 U.S.C.* [sic] *302),* known as the "Percy Amendment," applies to this project. The act provides a 10% price preference to U.S. firms on any Department of State contract when the project is estimated to exceed $5,000,000. The Percy Amendment also requires exclusion of firms from countries that exclude U.S. firms from their diplomatic construction projects. The requirements of the Act will be applied to all Phase II proposals received. The Offeror must complete and submit as part of its pre-qualification package the "Percy Amendment Certification Form." *(The form is attached to this FEDBIZOPPS announcement and may be obtained from the DOS Contract Specialist listed at the end of this notice.)* The form must be completed and included as part of the pre-qualification package. If a joint venture is formed, the company having 51 percent or greater interest in the JV must be the one completing the form.

(emphasis in original). Non-United States firms could still compete for the contract, but were not eligible for the ten percent price preference.

The Percy Amendment Certification Form was attached to the Pre-qualification Notice. Section (e) of the Percy Amendment Certification Form stated: "By signing this

form, the bidder/offeror certifies to the best of its knowledge, all of the representations and certifications provided in this provision are accurate, current and complete." According to the Certification Form, to qualify as an American-owned firm, the offeror must demonstrate evidence of:

(1) Performance of similar construction work in the United States or at a United States diplomatic or consular establishment abroad; and

(2) Either --

(i) Ownership in excess of 50% by U.S. citizens or permanent residents; or

(ii) Incorporation in the United States for more than three (3) years and employment of U.S. citizens or permanent residents in more than half of the company's permanent full-time professional and managerial positions in the United States.

As evidence of "similar construction work," the Percy Amendment Certification Form asked offerors to describe "similar construction work in the United States or at a United States diplomatic or consular establishment abroad," which must include "one or more similar projects completed in the United States." The form required offerors to list the location, complexity, type of construction, and value of each listed project. If the offeror was a partner or co-venturer on the previous project, the form asked the offeror to "indicate the percentage of the project performed by the bidder/offeror: _____ %."

Plaintiff and Desbuild-REC were among the twenty-seven offerors that submitted Phase I submissions in response to the Pre-qualification Notice. Phase I submissions were evaluated by defendant's Pre-qualification Review Panel, which reported its findings to Mr. Krips. Defendant's Legal Advisor, Dennis Gallagher, conducted the initial evaluation of offerors' eligibility for the Percy Amendment price preference and directed the memorandum containing his findings to Mr. Krips.

In plaintiff's Phase I submission, Caddell indicated that it did not plan to form a joint venture for the Moscow project, so Factor 1, Joint Venture Agreement/Signed Statement of JV Intent and Description of Partnership, was not applicable to plaintiff. Plaintiff's Phase I submission stated that Caddell "is one of the State Department's most experienced and proven prime contractors with more than **$2.1 billion in current and completed embassy and consulate projects (23),** almost all design/build." (emphasis in original). To satisfy Subfactor 2A, Technical Project Experience, plaintiff submitted three previous projects: 1) construction of a new office building at the United States Embassy in [redacted], valued at [redacted], 2) the design/build of a United States Embassy Complex in [redacted], valued at [redacted], and 3) the design/build of a new Embassy compound in [redacted], valued at [redacted]. Plaintiff's Phase I submission also included a Percy Amendment Certification Form, which listed three previous projects as evidence of "similar construction work:" 1) the design/build of a [redacted],

6

valued at [redacted], 2) the design/build of a [redacted], valued at [redacted], and 3) new construction of a [redacted], valued at [redacted].

In compliance with Subfactor 2B, Past Performance, plaintiff's Phase I submission addressed performance issues on all of the projects listed in its submission, indicating that it had no performance problems to report for the three "relevant projects" submitted to satisfy Subfactor 2A, Technical Performance Experience. Plaintiff's Phase I submission stated that it did not include references because defendant, "[p]er an e-mail response from Mr. Krips dated February 23, 2012," had communicated to Caddell that, because Caddell had submitted references for a different project in the same fiscal year, defendant would "accept the previously submitted information." Plaintiff's Phase I submission also included a Business Management Plan Narrative and an Organization Chart in compliance with Factor 3, Business Management Plan and Organization.[6]

Intervenor and contract award winner, Desbuild-REC's, Phase I proposal included a Joint Venture Agreement, which indicated that Desbuild, Inc. (Desbuild) was the [redacted] percent majority partner, and REC International (REC) was the [redacted] percent junior partner in the Joint Venture. The Joint Venture Agreement also stated:

> Desbuild, as the Leader of the Joint Venture, will be authorized for all matters concerning the relations with the members of the JV Team. The JV Members will be jointly and severally responsible and liable for fulfilling the obligations and commitments related to the works which are within the scope of works under the Project contract signed; and will not withdraw from the Joint Venture before the expiration of the Project contract signed with the U.S. Government.

> The Joint Venture Members also agree that all correspondence and notifications between the Joint Venture Members, and the Leader of the Joint Venture will be deemed to have been sent to the Joint Venture and binding for all companies in the Joint Venture.

The Joint Venture Agreement designated Mr. Sami Inanc Yurtbay, Proposal Manger for REC, to handle pre-qualification and proposal documents on behalf of the Joint Venture.

To satisfy Subfactor 2A, Technical Project Experience, Desbuild-REC's Phase I proposal listed two projects for Desbuild, and three projects for REC as examples of relevant past projects. For Desbuild, the Joint Venture submitted a [redacted], valued at [redacted], for which Desbuild was the sole contractor. Under "Description of Project Scope & Relevancy to Work Required for this Contract," Desbuild wrote:

[redacted]

---

[6] Neither defendant nor intervenor dispute plaintiff's compliance with Factor 2 or Factor 3.

Desbuild also submitted a "Design & Build" renovation project at the [redacted], valued at [redacted], for which Desbuild was also the sole contractor. Under "Description of Project Scope & Relevancy to Work Required for this Contract," Desbuild wrote:

[redacted]

Desbuild-REC's Phase I submission listed three separate examples of relevant past projects to satisfy Subfactor 2A, Technical Project Experience, for REC: [redacted].[7]

The Desbuild-REC Joint Venture also submitted a Percy Amendment Certification Form with its Phase I proposal. As evidence of "similar construction work," Desbuild listed three projects, one of which, the [redacted] project, which involved the [redacted],[8] Desbuild also had submitted as a "relevant project" to satisfy Subfactor 2A, Technical Project Experience. Two other projects, however, were included only on Desbuild's Percy Amendment Certification Form: the design/build of a new consulate building in [redacted], valued at [redacted], and an interior/exterior renovation of an office building in [redacted], valued at [redacted]. Desbuild's Percy Amendment Certification Form stated: "Desbuild Inc. was [redacted] JV partner on the project in [redacted]. On all other projects, Desbuild Inc. was [redacted] owner." To meet the statutory requirements, Desbuild's Percy Amendment Certification Form also indicated that Desbuild was owned in excess of fifty percent by United States citizens or permanent residents, and had been incorporated in the United States for more than three years. Desbuild-REC's Percy Amendment Certification form was signed by Desbuild's Director, Ananth Badrinath, indicating, as stated above, that Desbuild certified the information provided as "accurate, current, and complete."

In compliance with Subfactor 2B, Past Performance, Desbuild-REC's Phase I proposal also included information on past performance problems associated with four of the five projects submitted under Subfactor 2A, Technical Project Experience, including REC's [redacted] project in St. Petersburg, Russia, and [redacted] project in Moscow, Russia, as well as Desbuild's [redacted] and [redacted] projects. Desbuild-REC also submitted Past Performance questionnaires for one project previously performed by Desbuild, and two projects previously performed by REC. Furthermore, Desbuild-REC's Phase I submission included a Business Management Plan in compliance with Factor 3, Business Management Plan and Organization, which detailed

---

[7] As indicated below, defendant found that REC demonstrated sufficient Technical Project Experience based on the three submitted projects and plaintiff does not challenge defendant's decision that REC submitted projects that were relevant to the Moscow project to pre-qualify under Subfactor 2A, Technical Project Experience.

[8] In the section of Desbuild-REC's Phase I submission where the [redacted] project was listed as a "relevant project" under Subfactor 2A, intervenor called the project a "Design & Build" contract, but on its Percy Amendment Certification Form, intervenor labeled the [redacted] project a "Design/Build" project.

the organizational structure of the Desbuild-REC Joint Venture. According to the Business Management Plan, the Desbuild-REC Joint Venture would have an Executive Committee with [redacted] representatives from each partner firm, which would be responsible for overseeing the project. The Business Management Plan indicated that Desbuild-REC would have a Head Office in Washington, D.C., in Desbuild's existing office space, while REC's existing regional headquarters in Moscow would serve as the Project Support Office, and a Project Site Office would be established at the job site in Moscow. The Business Management Plan stated that the Head Office in Washington:

[redacted]

The Business Management Plan indicated that the Project Support Office in Moscow:

[redacted]

The Business Management Plan indicated that the Project Site Office:

[redacted]

The Business Management Plan explained that the Project Site Office would be managed by [redacted]. The Business Management Plan also provided resumés for [redacted] Senior Project Managers, [redacted] Project Managers, and a [redacted], all of whom were Desbuild employees, and provided credentials for six REC employees.[9]

The administrative record contains conflicting information about how many offerors pre-qualified in Phase I of the procurement. On April 30, 2012, defendant posted on FedBizOpps a List of PreQualified Firms-Moscow Annex able to proceed to Phase II, which indicated that six "U.S. Firms," and nine "Non-U.S. Firms" had been pre-qualified. Defendant's Recommendation for Contract Award, issued after defendant's evaluation of Phase II offers, however, stated that only five out of the ten "U.S. Firms" that submitted Phase I proposals had been pre-qualified, while an additional seven of the seventeen "non-U.S. firms" that had submitted Phase I proposals had been pre-qualified. The FedBizOpps List of PreQualified Firms-Moscow Annex listed, 1) AICI-SP, 2) B.L. Harbert International, LLC, 3) Caddell Construction Company, 4) Desbuild-REC International JV,[10] 5) Framco-Kolin-Epik (FKE JV), and 6) Walsh Pernix JV, as "U.S. Firms" that were permitted to move on to Phase II. The Recommendation for Contract Award authored by Mr. Krips after the Phase II proposals were submitted, however, indicated that AICI-SP had submitted a Phase I proposal, but had not been pre-qualified. Similarly, the FedBizOpps List of PreQualified Firms-Moscow Annex listed the following nine "Non-U.S. Firms" as pre-qualified firms: 1) Ant Yapi Sanayi ve Ticaret Ltd. Sti., 2) Kayi Construction Inc., 3) Nurol-Kuanta JV, 4) Rizzani de Eccher, 5) Rasen Story

---

[9] The specific roles for the six REC employees for the Moscow project were not clearly delineated in Desbuild-REC's Phase I Business Management Plan.

[10] As discussed below, Desbuild-REC was originally determined not to be pre-qualified to move on to Phase II of the contract solicitation.

LLC/Rasen Construction/Rasen International Joint Venture, 6) Summa Turizm Yatirimciligi, 7) TACA Construction Inc., 8) Yuksel Insaat A.S., and 9) Zafer Taahhut Insaat ve Ticaret. Defendant's Recommendation for Contract Award, however, showed that Nurol-Kuanta JV and Yuksel Insaat A.S. had submitted Phase I offers, but had not pre-qualified. It appears, therefore, that at least five, and possibly six, "U.S. Firms," and at least seven, but possibly nine, "Non-U.S. Firms" were allowed to move on to Phase II of the procurement.

Caddell received a passing score on each technical factor and an overall rating of "PASS" for its Phase I submission, pre-qualifying Caddell to submit a Phase II proposal. Caddell also was found to qualify for the Percy Amendment price preference.

Desbuild-REC received a "PASS" on Factor 1 of the pre-qualification criteria, Joint Venture Agreement/Signed Statement of JV Intent and Description of Partnership, but received a "FAIL" rating on Factor 2, Technical Project Experience and Past Performance, and thus an overall rating of "FAIL." Desbuild-REC also did not initially qualify for the Percy Amendment price preference.

The story of how, after reviewing Desbuild-REC's Phase I submission, defendant's Pre-qualification Review Panel assigned Desbuild-REC a failing mark for Factor 2, Technical Project Experience and Past Performance, but Desbuild-REC, nonetheless, was found to qualify for Phase II and the Percy Amendment price preference, is far from transparent in the record before the court. In the Initial Recommendation of defendant's Pre-qualification Review Panel, addressed to Mr. Krips, and dated April 4, 2012, the review panel members failed Desbuild-REC on Factor 2 and stated:

> REC has done projects of similar and greater complexity than the Moscow NOX. However, the panel was concerned that Desbuild does not show sufficient experience in handling a project of this size based upon the examples provided in the prequalification package (examples provided include [redacted]. Contractor mentioned some performance problems that were, apparently, caused by the client. Initially, three of the 4 team members gave the JV a "passing mark" in this category. During the consensus meeting there was much discussion about whether or not to pass the JV based upon REC International's experience or not. Also, team members were aware of the ongoing project in [redacted] being constructed by the [redacted] JV, but no information was provided by the contractor in the prequalification package. Even though the [redacted] project[11] is in excess of [redacted], it was not evaluated. After much discussion, the panel finally decided to not qualify the JV.

---

[11] The [redacted] project was included in Desbuild-REC's Phase I submission as an example of "similar construction work" on Desbuild's Percy Amendment Certification Form, but not as a "relevant project" for the purposes of Subfactor 2A, Technical Project Experience. Mr. Gallagher, therefore, reviewed the [redacted] project for eligibility for the Percy Amendment price preference, but the [redacted] project was not supposed to

10

The Pre-qualification Review Panel determined that Desbuild-REC did not pre-qualify for the contract and stated that Desbuild-REC received an overall "FAIL" because "Desbuild does not have relevant experience."

Regarding the Percy Amendment price preference, defendant's Legal Advisor, Dennis Gallagher, initially reviewed the pre-qualification packages of ten United States firms[12] that submitted Phase I proposals to determine if the firms qualified as "American-owned" under the Percy Amendment. On April 3, 2012, Mr. Gallagher sent a Review of Percy Qualifications memorandum[13] to Mr. Krips, detailing Mr. Gallagher's findings. Mr. Gallagher stated that Desbuild-REC's eligibility for the Percy Amendment was a "close call." He placed a question mark on the line labeled "Yes" for "Qualifies under Percy," and wrote under "Comments:" "Desbuild ([redacted]) is U.S. firm and was minority ([redacted]) partner in [redacted] project, which is similar in size and type of construction. Other projects not similar. Close call if minority JV partner should be credited with completion of project, but guess so." Mr. Gallagher indicated that the [redacted] project qualified as "similar construction work" for the Moscow project, but was unsure whether Desbuild should be credited with the [redacted] project for Percy Amendment purposes, because Desbuild was only a [redacted] joint venture partner. Mr. Gallagher concluded, that he "guess[ed]" Desbuild-REC should qualify for a Percy Amendment price preference.

On April 6, 2012, Mr. Krips sent a letter notifying Desbuild-REC's representative, Mr. Yurtbay, that Desbuild-REC did not qualify to submit a Phase II proposal. Mr. Krips' April 6, 2012 letter explained that Desbuild-REC did not qualify because it had received a failing mark on Factor 2, Technical Project Experience and Past Performance, stating:

> While REC International produced evidence of performing a project similar in scope, complexity, and dollar value of the Moscow NOX [New Office Annex] project, Desbuild Inc. did not. Evaluation factor 2A.4 (JV Project examples) requires that each partner must show examples of project(s) that are similar in scope, complexity and dollar value of the Moscow project. The Desbuild projects in [redacted] do not qualify as relevant projects.

be reviewed by defendant's Pre-qualification Review Board while determining whether Desbuild-REC had sufficient Technical Project Experience to satisfy Subfactor 2A.

[12] The administrative record does not explain why the ten firms were evaluated for Percy Amendment eligibility, but it seems that all offerors that represented themselves as United States firms were considered for the Percy Amendment price preference.

[13] The copy of Mr. Gallagher's memorandum initially submitted in the administrative record was illegible. The court issued numerous Orders before defendant submitted a more legible copy and a certified transcription of Mr. Gallagher's comments regarding Desbuild-REC.

11

On April 9, 2012, Desbuild-REC replied to Mr. Krips, requesting a pre-award debriefing in accordance with Federal Acquisition Regulation (FAR) 15.505 (2012).[14] Desbuild-REC's April 9, 2012 letter cited to the provision of the Pre-qualification Notice that stated that defendant could consider offerors' "combined project examples" and asked defendant to explain why Desbuild and REC did not collectively meet the requirements Subfactor 2A, Technical Project Experience. Desbuild-REC also included a series of fourteen questions it posed to defendant, regarding how defendant had conducted its evaluation. In addition, Desbuild-REC's April 9, 2012 letter stated that Desbuild's role in the Moscow project would be "limited" and that Desbuild did not intend to have any United States citizens posted on-site.

Four days after Desbuild-REC's letter was sent to defendant, defendant's Contracting Officer, Robert Powell,[15] responded to Desbuild-REC. Mr. Powell's April 13, 2012 letter stated:

Upon receipt of your letter dated April 9th, our prequalification panel went through an extensive reevaluation of the package that you have submitted. Following careful consideration, the panel has determined that the Desbuild-REC JV **is** qualified to continue on to the bidding process due to the cumulative experience of the JV members.

However, we have also determined that Desbuild-REC does **not** qualify for the price advantage denoted in the Percy Amendment. The amendment specifically requires that the American-owned firm must have performance of similar construction work in the United States or at a United States diplomatic or consular establishment abroad. While the

---

[14] In the briefs and at oral argument, plaintiff characterized both the April 9, 2012 and the April 19, 2012 letters, discussed below, each sent to the defendant, as being sent solely by REC. At oral argument, however, plaintiff conceded that the letters came from the joint venture. The letters were on Desbuild-REC Joint Venture letterhead and were signed by Mr. Yurtbay, who was designated in Desbuild-REC's Joint Venture Agreement as the individual responsible for handling all pre-qualification and proposal documents on behalf of the Joint Venture. Desbuild-REC's Joint Venture agreement also stated that "all correspondence and notifications between the Joint Venture Members, and the Leader of the Joint Venture will be deemed to have been sent to the Joint Venture and binding for all companies in the Joint Venture."

[15] Defendant refers to Robert Powell as the Contracting Officer for the Moscow project and Mr. Powell's name was listed on the Phase II Solicitation as the Contracting Officer. The title stated on Mr. Powell's April 13, 2012 letter was Director, Facilities Design and Construction Division, Office of Acquisitions Management. This is the first document in the administrative record to mention Mr. Powell. It is not clear from the record why Mr. Powell responded to Desbuild-REC instead of Mr. Krips, who, up until that point, had been the agency's point of contact for offerors and who authored defendant's first letter to Desbuild-REC on April 6, 2012.

[redacted] project is of similar size, scope and dollar value, the fact that Desbuild was only a [redacted] partner on the project causes this to not be relevant. Therefore, any bid submitted by your firm will be evaluated at the price given only.

(emphasis in original). There are no documents included in the administrative record between Desbuild-REC's April 9, 2012 letter and Mr. Powell's April 13, 2012 response. In the record before the court, therefore, there is no documentation to explain Mr. Powell's answers to Desbuild-REC's questions or why the defendant reevaluated the intervenor's submission. There also is no analysis, justification or explanation in the record for the Department of State's reversal of its earlier decision to fail Desbuild-REC on Phase I Factor 2, Technical Project Experience and Past Performance. Moreover, defendant's indication in its April 13, 2012 letter that Desbuild did not qualify for the Percy Amendment price preference because it was not credited with the [redacted] project differs from the initial, albeit tentative, recommendation by defendant's Legal Advisor, Mr. Gallagher. Mr. Gallagher had concluded that he "guess[ed]" Desbuild should be credited with the [redacted] project and had indicated that Desbuild-REC may have been able to qualify for the Percy Amendment price preference by placing a question mark on the line labeled "Yes" under "Qualifies for Percy." Mr. Powell's April 13, 2012 letter makes no mention of Mr. Gallagher's recommendation, therefore making it unclear who within the Department of State made the determination that Desbuild-REC should not qualify for the Percy Amendment price preference.

On April 19, 2012, Desbuild-REC responded to Mr. Powell's April 13, 2012 letter, arguing that the "Percy Amendment determination is based on inadvertent errors and a misunderstanding of Desbuild's role and the relevant considerations," and requesting reconsideration of defendant's Percy Amendment price preference decision. With respect to the [redacted] project, Desbuild-REC's letter stated:

It is correct that Desbuild was a [redacted] partner on that project. However, the [redacted] referred to Desbuild's overall profit share, not Desbuild's day-to-day role. On that project, Desbuild had a substantial staff and had significant responsibilities for numerous highly relevant areas including design coordination; project management; onsite supervision; material procurement and shipping and selection of local vendors and subcontractors.

Under the prequalification solicitation, project examples for which the offeror self-performed at least 30% of the work are considered relevant. See Factor 2, ¶ 2A.5 ("Project examples in which the Offeror only acted as a General Contractor or did not self-perform at least 30% of the work will not be considered relevant."). This indicated a 30% relevancy test, Desbuild meets that requirement for the [redacted] project.

In the April 19, 2012 letter, Desbuild-REC also argued that crediting Desbuild with the [redacted] project would be consistent with United States Government

Accountability Office (GAO) precedent, as well as prior conduct by defendant on other projects. For example, Desbuild-REC stated:

> Desbuild - Larsen and Toubro Limited JV was prequalified for the New Delhi NOX project in 2011 based on similar past performance where Desbuild had served as a [redacted] JV member (Reference -Mumbai Project). There is no reason for a different approach here. We believe there are many other instances of OBO crediting the prime offeror with the past performance of a JV member where the JV member performed substantial work, but less than 50%.

Desbuild-REC continued: "Here, the solicitation indicated that past performance would be considered if the contractor had 30% or more involvement. See Factor 2, ¶ 2A.5. Certainly, the solicitation did not prohibit consideration and reliance on Desbuild's significant [redacted] performance." Desbuild-REC asserted that Desbuild-REC should qualify for the Percy Amendment price preference because Desbuild was responsible for a significant portion of the [redacted] project and because the Pre-qualification Notice provided that thirty percent was a threshold for being credited with a previous project. The section of the Pre-qualification Notice that Desbuild-REC cited to, Factor 2, ¶ 2A.5, however, pertained to examples of "relevant projects" under Subfactor 2A, Technical Project Experience, not to the examples of "similar construction work" for the purposes of the Percy Amendment.

Mr. Powell responded to Desbuild-REC four days later on April 23, 2012, reversing the previous negative Percy Amendment decision. Mr. Powell's April 23, 2012 letter stated in its entirety: "In discussions with OBO's legal advisor and under further review by the pre-qualification panel, we have determined that your Desbuild-REC **is** qualified to receive the price advantage denoted in the Percy Amendment." (emphasis in original). Similar to the defendant's unexplained reversal of its determination to fail Desbuild-REC on Phase I Factor 2, Technical Project Experience, Mr. Powell's April 23, 2012 letter did not give any explanation or justification of why defendant reversed its initial Percy Amendment decision. There are no documents whatsoever in the administrative record documenting any intervening discussions with defendant's legal advisor or contracting officer, nor any "further review by the prequalification panel."

As mentioned above, on April 30, 2012, defendant issued a list of pre-qualified offerors for the Moscow Project on FedBizOpps entitled "List of PreQualified Firms-Moscow Annex." Caddell and Desbuild-REC were both listed as pre-qualified "U.S. Firms," although the listing did not mention Percy Amendment eligibility or that Desbuild-REC was initially rejected for pre-qualification. The "List of PreQualified Firms-Moscow Annex" indicated that six "U.S. Firms" and nine "Non-U.S. Firms" had been pre-qualified for the contract.

Defendant subsequently issued Solicitation No. SAQMMA-12-R-0117 on May 18, 2012. The Solicitation instructed offerors to address offers to Mr. Krips and to contact

14

Mr. Krips for any additional information. Section M of the Solicitation listed the "Evaluation Factors for Award." Section M began by explaining the relationship between Phase I and Phase II of the procurement process, stating: "Offerors have been prequalified during Phase I of this acquisition. During the prequalification process, many areas of technical qualifications were evaluated and analyzed. This section describes additional evaluation factors and procedures." The Solicitation reiterated that the contract would be awarded on a best-value basis, stating: "**The contract award will be made to the acceptable, responsible Offeror based on that Offeror's proposal which offers to the Government the best value in terms of technical and price factors**." (emphasis in original). The Solicitation described the trade-off process that would be used to determine which offer represented the best value to the government, as follows:

> The Government may consider award to other than the lowest priced offeror or other than the highest technically rated offeror based upon the evaluation factors and sub factors stated in the solicitation. This source selection will be based upon Best Value and may result in an award being made to a higher rated, higher priced offeror where the decision is consistent with the evaluation factors and where it is deemed by the Government that the technical superiority, overall business approach, and/or the past performance of the higher priced offer outweighs the benefits of any price difference. The Government, using sound business judgment, will base the source selection decision on a trade-off analysis of the proposals submitted in response to this solicitation in accordance with the evaluation factors established for this solicitation.

(emphasis added).

There were two evaluation factors included in the Phase II Solicitation: Cost/Price, which was to be addressed in Volume I of offerors' Phase II proposals, and Management/Technical, which was to be addressed in Volume 2. The Solicitation ranked the Management/Technical factor more highly than the Cost/Price factor, stating: "Proposals shall be evaluated in business management and cost/price areas. **The business management/technical proposal (Volume 2 of proposal) is ranked as significantly more important than the price proposal (Volume 1 of proposal).**" (emphasis in original). In terms of Cost/Price, the Solicitation stated that "[a] fixed price is required." The Solicitation also indicated that six factors would be considered in price negotiations, if negotiations were required, including: 1) price reasonableness, 2) price completeness, 3) the government's evaluation of price proposals, and 4) Percy Amendment price preferences.[16] The Solicitation explained that the Cost/Price factor

---

[16] The two other factors listed in the Solicitation at sections M.3.1.1.2 and M.3.1.1.5 are marked "Reserved" in the copy of the Solicitation provided to the court.

15

"will be evaluated based on the total price proposed for performance as specified in Section B" of the Solicitation.[17]

Under the Management/Technical factor, the Solicitation instructed offerors to include a Management Plan, which was to contain "a general summary outlining your understanding of the overall scope for construction services." In addition, the Management Plan was intended to:

> convincingly demonstrate[] that team members are able to successfully perform within the parameters and requirements of the project and to resolve problems as they develop during the work. This Plan should identify the anticipated overall challenges, such as site, local conditions, environmental, personnel, housing, security, shipping, and materials, and the like and the plan for adequately managing these challenges.

Although defendant's Pre-qualification Notice required offerors to include "a brief description of its business management plan" in their Phase I submissions, the Solicitation set forth more detailed requirements for offerors' Phase II Management Plan. Specifically, the Solicitation required offerors to address six subfactors in their Phase II Management Plan: 1) Organization and Staffing Plan, 2) Executive/Supervisory Personnel, 3) Subcontractor Management Program, 4) Project Execution Plan, 5) Safety and Health Plan, and 6) Security Plan. The Solicitation explained how defendant would evaluate each of the subfactors under the Management/Technical factor. With regard to the Organization and Staffing Plan and Executive/Supervisory Personnel subfactors, the Solicitation stated:

> **The Government's evaluation will be based on the merit of the contractor's plan for organization and staffing including: (1) having key personnel with credentials required for the project including relevant experience and skills; (2) having well defined lines of authority, responsibility and communication; (3) having the ability to quickly respond to changes and mobilize to resolve problems; (4) having a sound recruitment plan when additional or replacement personnel are needed and a housing plan that addresses the requirements of L.24.3.**

(emphasis in original).

The Solicitation stated that defendant's evaluation of the Subcontractor Management Program subfactor "**will be based on a review of the contractor's subcontracting plan and how well the contractor will implement and maintain surveillance *over* Subcontractors to ensure performance is consistent with**

---

[17] Section B of the Solicitation set forth a formula for calculating the contract price. Plaintiff contests only defendant's determination that Desbuild-REC was eligible for a Percy Amendment price preference. Therefore, the court does not describe Section B of the Solicitation in detail.

**contract requirements.**" (emphasis in original). The Project Execution Plan subfactor would be evaluated "**based on appropriateness, realism, comprehensiveness, and technical soundness of the planned activities that are needed to accomplish the objectives of the delivery schedule.**" (emphasis in original). As to the Safety and Health Plan subfactor, the Solicitation stated: "**The Government shall evaluate Offeror's safety, health and sanitation policy in the workplace, and compliance with U.S. Army Corps of Engineers Safety & Health Requirements Manual EM385-1-1 and compliance with OSHA [Occupational Safety and Health Administration] construction industry standards. Comprehensiveness of safety and health program management elements and safety/health training program content will be evaluated.**" (emphasis in original). The Solicitation also indicated that defendant's evaluation of the Security Plan subfactor would be based on "**the feasibility of the Contractor's Security Plan to assure compliance with contract security requirements. Evaluation includes comprehensiveness of plan in covering all facets of security requirements and adequacy of staffing.**" (emphasis in original).

Plaintiff Caddell and Desbuild-REC both submitted Phase II proposals, as did five other offerors.[18] Plaintiff's and Desbuild-REC's Phase II submissions were both broken up into two volumes, as required by the Solicitation, with Volume I addressing the Cost/Price factor and Volume II addressing the Management/Technical factor. Plaintiff's Phase II Cost/Price submission indicated that the "Total Evaluated Price," which the Solicitation stated should include the costs for "all elements of the project" except Value Added Taxes (VAT), was [redacted], and that the "Grand Total Price," which the Solicitation indicated should be the "Total Evaluated Price" plus the VAT, was [redacted]. In addition, plaintiff's Phase II Cost/Price submission stated that, if plaintiff were awarded the Moscow contract, plaintiff intended to employ [redacted] United States citizens, [redacted], and [redacted]. Caddell's Phase II Cost/Price submission also included a Percy Amendment Certification Form, which included different project information than plaintiff's Phase I Percy Amendment Certification Form. Caddell's Phase II Percy Amendment Certification Form listed three projects as evidence of "similar construction work:" 1) the design/build of a New Embassy Compound in [redacted], valued at [redacted],[19] 2) the design/build of a New Embassy Consulate in [redacted], valued at [redacted], and 3) the design/build of a New Embassy Compound in [redacted], valued at [redacted].[20]

---

[18] The five other offerors included Ant Yapi Sanayi ve Ticaret Ltd., TACA Construction Inc., Zafer Taahhut Insaat A.S., B.L. Harbert International, LLC, and FKE JV.

[19] The [redacted] project was included in plaintiff's Phase I submission, but as a "relevant project" to satisfy Subfactor 2A, Technical Project Experience, rather than on plaintiff's Phase I Percy Amendment Certification Form.

[20] As indicated above, plaintiff's Phase I Percy Amendment Certification Form listed a design/build project in [redacted], and a design/build and new construction project in [redacted], as evidence of "similar construction work."

Plaintiff's Phase II Management/Technical submission began with a General Summary Narrative, which indicated that, for the Moscow project, Caddell would be working with "long-time Caddell project consultant ENKA Construction, based in Istanbul, Turkey. Caddell has worked with ENKA on 14 major OBO embassy projects. Most importantly, ENKA is one of the most experienced contractors in Russia and has had a continual presence in the Moscow market for more than 20 years." The General Summary Narrative section of Plaintiff's Phase II Management/Technical submission also described plaintiff's understanding of the scope of the Moscow project and addressed "Anticipated Challenges & Risks." Plaintiff's Phase II Management/Technical submission went on the address each of the other subfactors required by the Solicitation, including plaintiff's Organization and Staffing Plan, Executive/Supervisory Personnel, Subcontractor Management Program, Project Execution Plan, Safety and Health Plan, and Security Plan.

Desbuild-REC's Phase II Cost/Price submission stated that the "Total Evaluated Price" of its proposal was [redacted], but that, when including a [redacted] "VAT Reimbursement Provisional Sum," the "Grand Total Price" was [redacted]. Desbuild-REC's Phase II Cost/Price submission also included a Percy Amendment Certification Form, which matched the Percy Amendment Certification Form submitted with Desbuild-REC's Phase I submission.

Desbuild-REC's Phase II Management/Technical submission included a Management Plan that addressed the "Technical Scope & Risk" of the Moscow project, as well as the organization of the Desbuild-REC Joint Venture. Desbuild-REC's Phase II Management Plan included a list of personnel who would sit on the Joint Venture's Executive/Supervisory Panel, as well as a "Staff/Key Personnel (Project Management) Replacement List," but it is unclear from the two lists whether the individuals named were Desbuild or REC employees. Desbuild-REC's Phase II Management Plan further stated that REC had [redacted] employees located in Russia, but that head office personnel would be located in Desbuild's Washington, D.C. office. In addition, the Phase II Management Plan indicated that the Joint Venture would hire a minimal number of United States citizens to work on site because of security clearance requirements, stating:

[redacted]

Desbuild-REC's Phase II Management Plan also addressed each of the other subfactors required by the Solicitation, including an Organizational and Staffing Plan, Subcontractor Management Plan, Safety and Health Plan, and Security Plan.

Defendant first evaluated the seven offerors' initial Phase II Cost/Price proposals. Defendant's Evaluation of the Contractors' Price Proposals indicated that Caddell's initial Phase II proposal had a "Grand Total Contract Price" of [redacted], while Desbuild-REC's "Grand Total Contract Price" was evaluated at the higher price of [redacted]. The Evaluation of Contractors' Price Proposals noted, however, that Desbuild-REC's "Grand Total Contract Price" included a [redacted] VAT reimbursement,

while plaintiff "failed to enter VAT number."[21] Defendant's Office of Cost Management performed a cost analysis, which it forwarded to Mr. Krips, and which found that, excluding the Percy Amendment price preference, Ant Yapi's, Desbuild-REC's, and TACA's offers had the lowest prices.[22] The cost analysis stated that, without the VAT, plaintiff also had one of the lowest prices, but that plaintiff needed to confirm whether its price included the VAT. The cost analysis then explained that, applying the ten percent, Percy Amendment price preference for eligible offerors, "DES BUILD [sic] is then considered best value, provided that CADDELL confirms the inclusion/exclusion of the VAT cost."

Defendant's Technical Evaluation Board conducted an evaluation of the seven offerors' Management/Technical proposals and reported its findings to Mr. Krips. With regard to plaintiff Caddell's Phase II Management/Technical submission, the Technical Evaluation Board gave plaintiff a very positive review, but questioned Caddell's [redacted] and its possible impact on completion and price, stating:

> The management plan demonstrates that Caddell has a very good understanding of the scope of the project and therefore has developed a sound and well thought out approach to managing the various phases of the project. The management plan reflects clean lines of authority for the team and expresses awareness and firsthand knowledge of the challenges posed by undertaking a project in Moscow. Caddell developed a very detailed and comprehensive set of anticipated challenges and risks and outlined the measures that would be taken to mitigate same. They also provided examples of projects with similar circumstances. Caddell used good examples to demonstrate how to mitigate subcontractor issues. Their proposal was very responsive to the requested details on Project Management Manpower resources. Caddell's familiarity with OBO requirements is quite evident in their proposal. The PES [Project Execution Schedule] is fairly well thought out. Caddell provided a good project schedule narrative and an accompanying Primavera PES as required by the RFP. The safety plan included and addressed all OBO requirements and proposed the use of a good safety manager. The security plan provided is comprehensive and well articulated. Caddell

---

[21] In its Best and Final Offer, plaintiff corrected its exclusion of a VAT amount in its initial Phase II proposal. When evaluating price proposals for the offerors' initial Phase II offers, however, defendant sometimes compared Caddell's price exclusive of the VAT to other offerors' price including the VAT, which affected the rankings of the offerors' price proposals. At [redacted], plaintiff's initial Phase II proposal, excluding the VAT, was lower than Desbuild-REC's initial price proposal, excluding the VAT, which was [redacted].

[22] As indicated above, at this point in the procurement, Caddell's price was lower than Ant Yapi's, Desbuild-REC's, and TACA's. Defendant considered Caddell separately for the purposes of this analysis, however, because of Caddell's failure to include an amount for the VAT in its price proposal.

19

obviously knows our security requirements. The panel has one primary concern with the Caddell proposal and its Project Execution Plan contained therein. The concern involves the [redacted].

Caddell is teamed with [redacted]. Caddell has worked on numerous OBO projects and has [redacted] of experience working with [redacted]. [redacted] has a database of skilled workers.

Both the recruitment and housing plan proposals were considered to be acceptable.

In summary, Caddell and [redacted] have put together a good and thorough proposal that clearly meets the intent of the RFP requirements. As indicated above their assumption regarding the [redacted] needs to be clarified.

As to Desbuild-REC's Phase II Management/Technical proposal, the Technical Evaluation Board also gave the Joint Venture a generally positive review, but questioned the proposed Project Manager's previous experience and the location of key personnel, as well as the citizenship of a key person required to be a United States citizen. The review stated:

The proposal reflects a good understanding of the project scope and the commissioning requirements. The joint venture developed an impressive and very detailed set of anticipated challenges and risks and outlined the measures that would be taken to address same. The joint venture partner (REC) is a firm licensed in Russia with a vast amount of experience doing construction in Russia and in particular, Moscow. The joint venture provided a good description of how it will integrate subcontractor work. The safety program proposed is more than adequate for a contractor who would be self performing all of the work. The security plan is somewhat in compliance with OBO procedures.

The joint venture needs to furnish a few more details regarding the projects on which the proposed Project Manager has worked in the past. There is no indication of the size, complexity or relevance of those past projects. The Organization Chart shows participants located in numerous areas. The Deputy Procurement Manager is to be in [redacted] while the Procurement Manager is in [redacted]. The Program Manager is to be in [redacted] while the Program Manager [sic] is shown in [redacted]. This arrangement would appear to be a source of complication during project execution.

Contractor needs to clarify the citizenship of the Safety and Health Manager since the Health Plan specifies that the designated manager is to be a U.S. citizen.

Clarification is also needed for what the contractor describes as an [redacted]. Is this a contractor operated facility and if so what medical personnel are going to work there?

Contractor indicates under the Security Plan that they will "operate" the ACF [Access Control Facility]. Their responsibility is only to build and maintain the ACF.

Both the recruitment and housing plan proposals were considered to be acceptable.

The proposal confirms that the Joint Venture fully understands project requirements and its complexity. The joint venture has all facilities and personnel required and essentially in place. Contractor has full understanding of all local codes, laws, regulations and procurement logistics.

Joint venture plans to staff project with a strong team. Proposal displays a superior subcontractor management process/program. The proposal clearly met RFP requirements.

The Technical Evaluation Board's overall evaluation of the offerors' Phase II Management/Technical submissions was as follows:

It is the consensus of the TEB [Technical Evaluation Board] that while Caddell's technical proposal is rated slightly higher than Desbuild-REC JV's technical proposal, the TEB feels that these two proposals are superior to the other technical proposals and stand in a category of their own. It is noted that these two firms are the only ones who are firmly established in Moscow and have ongoing construction projects similar in scope to the Moscow NOX.

Defendant established a competitive range for the Moscow project consisting of three offerors: Caddell, Desbuild-REC, and FKE JV. Defendant determined that Caddell, Desbuild-REC, and FKE JV should be included in the competitive range because they each "submitted acceptable technical proposals and competitive prices." Mr. Krips prepared defendant's Competitive Range Determination, which was also "cleared by" Ezel Silver, "Chair, Technical Evaluation Board," PK Bagchi, "Project Manager, Moscow NOX," and Jamie E. Salcedo, "Director, OBO/PDCS/SPC," and was "approved by" Mr. Powell, "Contracting Officer." The Competitive Range Determination indicated that the competitive range was established after a meeting was held with members of the Technical Evaluation Board, during which the offerors' technical and price evaluations were discussed.[23] Defendant's Competitive Range Determination

---

[23] The Competitive Range Determination does not indicate who attended that meeting.

stated that, after taking into account the Percy Amendment price preference for qualifying offerors, plaintiff Caddell's price was evaluated as the lowest, while Desbuild-REC's price was evaluated as the second-lowest.[24] Caddell also received the highest technical rating, with Desbuild-REC coming in second. The Competitive Range Determination stated: "Caddell's technical proposal was rated slightly better than Desbuild-FKE [sic] JV's[25] technical proposal." Defendant invited plaintiff, Caddell, Desbuild-REC, and FKE JV to submit Best and Final Offers, which, after several rounds of negotiations, all three firms did on September 12, 2012.

Defendant's Technical Evaluation Board evaluated the final proposals from the three offerors included in the competitive range, and reported to Mr. Krips that it had come to a consensus opinion that Desbuild-REC's and Caddell's proposals earned a rating of "excellent," while FKE JV's proposal was rated "satisfactory." The Technical Evaluation Board recommended Desbuild-REC for contract award, explaining:

> The consensus report of the initial proposals indicated that Caddell's proposal was rated ever so slightly higher than Desbuild-REC Int'l JV's proposals. However, after holding discussions with the firms in the competitive range and evaluating the BAFO [Best and Final Offers] technical proposals, both firms are rated equally qualified from the technical standpoint. The TEB is confident that both Desbuild-REC Int'l JV and Caddell have the technical capability to successfully construct the NOX contract and any differences in their technical proposals are insignificant. After reviewing the BAFO prices, the TEB recommends that the Contracting Officer select Desbuild-REC Int'l JV for contract award because it offers the best value to the Government.

Defendant's Summary of Cost Proposals, issued on September 13, 2012, listed the initial proposal amounts and Best and Final Offers for each of the three offerors in the competitive range, all exclusive of the VAT and the Percy Amendment price preference. The Summary of Cost proposals indicated that Desbuild-REC JV's initial proposal had been [redacted], but its Best and Final Offer was [redacted] lower,[26] giving Desbuild-REC the lowest final price of [redacted]. Plaintiff [redacted] its initial proposal,

---

[24] The Competitive Range Determination used for its price evaluation the offerors' prices excluding the VAT and the Percy Amendment price preference, such that Caddell's offer was priced at [redacted] and Desbuild-REC's offer was priced at [redacted]. Once the Percy Amendment price preference was applied, Caddell's price fell to [redacted] and Desbuild-REC's price was [redacted].

[25] The reference to "FKE" appears to be an error. The document includes the correct name for Desbuild-REC in the line above, and listed FKE JV as the third and separate offeror in the competitive range.

[26] In fact, the difference between Desbuild-REC's initial and its best and final offer prices was [redacted].

making plaintiff's final price [redacted]. Finally, FKE JV's offer was priced higher than both plaintiff's and Desbuild-REC's, with a final price of [redacted].

The Director of the Office of Cost Management sent a Memorandum to Mr. Krips, containing a cost analysis of the three Competitive Range offerors' Best and Final Offers. The Office of Cost Management's cost analysis used the offerors' prices including the VAT, but did not take into account the Percy Amendment price preference. Desbuild-REC's Best and Final Offer, including the VAT, was [redacted], making it the lowest-priced final offer. Caddell's Best and Final Offer, including the VAT, was [redacted] and FKE JV's Best and Final Offer, including the VAT, was the highest-priced at [redacted]. Based on these numbers, the Office of Cost Management found: "the proposal submitted by the lowest bidder, DESBUILD REC at [redacted] represents the best value offer and therefore recommends acceptance."

Mr. Krips then authored an "**ACTION MEMORANDUM FOR ROBERT R. POWELL - SOURCE SELECTION AUTHORITY**," which was titled "Recommendation for Contract Award - Construction of New Annex Office Building, Moscow, Russia." (emphasis in original). Mr. Krips' Recommendation for Contract Award is undated. Mr. Krips' Recommendation for Contract Award indicated that defendant should select Desbuild-REC for award of the contract because its submission represented the best value to the government. Mr. Krips' Recommendation for Contract Award included a section on "Background Information," which summarized defendant's evaluation of proposals. Significantly, the Background Information section did not mention defendant's initial decision not to pre-qualify Desbuild-REC, or defendant's initial denial of a Percy Amendment price preference to Desbuild-REC, but instead listed Desbuild-REC as one of the "U.S. Firms" that pre-qualified for the contract. Regarding defendant's evaluation of the Phase II submissions, Mr. Krips' Recommendation for Contract Award indicated that a competitive range consisting of three firms had been established and that each of the three firms had submitted final proposals. Describing the Technical Evaluation Board's review of the offerors' final proposals, Mr. Krips' Recommendation for Contract Award stated:

> Going into the final round, Caddell's and Desbuild-REC JV's technical proposal were rated almost equal [sic] with Caddell's technical proposal receiving a very slight higher rating. FKE JV was rated somewhat lower than Caddell and Desbuild-REC JV. After the review of the final proposals, the TEB found that Caddell and Desbuild were rated almost equal.

Mr. Krips' Recommendation for Contract Award explained that the contract would be awarded on a best-value basis with technical criteria being "significantly more important than price criteria." Mr. Krips' Recommendation for Contract Award stated that Caddell and Desbuild-REC were both ranked number one on technical rankings, with FKE JV ranked number two, and that Desbuild-REC had the lowest price once the offerors made their Best and Final Offers. Mr. Krips' Recommendation for Contract Award used the offerors' Best and Final Offers including the VAT, but excluding the Percy Amendment price preference, for its price analysis. Therefore, it listed Desbuild-REC's

price as [redacted], Caddell's as [redacted], and FKE JV's as [redacted]. Mr. Krips' Recommendation for Contract Award also indicated that defendant had used a trade-off process[27] to determine which proposal represented the best value to the government, and had found:

> In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price. Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.

Based on the recommendations of both the Technical Evaluation Board and the Office of Cost Management, Mr. Krips recommended that the Contracting Officer, Mr. Powell, select Desbuild-REC for contract award.

The top of the first page of Mr. Krips' Recommendation for Contract Award reads "**ACTION MEMORANDUM FOR ROBERT R. POWELL - SOURCE SELECTION AUTHORITY**." The summary recommendation is next and followed by two side by side lines, one preceded by the word Approve ____, and the second Disapprove ____. Next to the words "**ROBERT R. POWELL** - **Source**" ("**Selection Authority**" is on the next line) the initials "RRP" (presumably Robert R. Powell) are initialed. Similarly, the initials "CK" are written in above the line that reads "FROM: OBO/PDCS/SPC – Charles G. Krips." It, therefore, appears that Mr. Powell and Mr. Krips each initialed Mr. Krips' Recommendation for Contract Award. There also is a box checked "Approve," which seems to be in the same writing as the "RRP." There are no documents included in the record between Mr. Krips' Recommendation for Contract Award and the signed contract awarded to Desbuild-REC on September 26, 2012, nor any narrative which indicated why Mr. Powell approved Mr. Krips' Recommendation or decided why Desbuild-REC should be selected for the contract award. The only documented rationale for defendant's decision to award the contract to Desbuild-REC was the recommendation authored by Mr. Krips.

The signed contract between the government and Desbuild-REC, dated September 26, 2012, suggests a further wrinkle. Under section "31a. NAME OF CONTRACTING OFFICER," the contract lists "Robert Powell." One line below, however, a different name, David W. Vivian, was signed in section 31b., as the signatory for the United States of America. This is the first mention of David W. Vivian in the chronology of events regarding the selection process for the contract. Defendant's subsequent September 26, 2012 letter to Desbuild-REC, informing Desbuild-REC that it had been awarded the contract, was also signed by "David W.

---

[27] It is unclear why defendant engaged in a best-value, trade-off process when Mr. Krips concluded that Desbuild-REC was both the lowest-priced and highest technically rated offeror. Applicable regulations incorporated into the Pre-qualification Notice state: "A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." 48 C.F.R. § 15.101-1 (2012).

24

Vivian, Contracting Officer." These are the only two items in the administrative record in which Mr. Vivian's name appears. Moreover, defendant's letters to FKE JV and Caddell, informing them that they had not been awarded the contract, were signed by "Robert R. Powell, Contracting Officer." The record before the court does not explain the relationship between, or decisional responsibilities of, Mr. Powell and Mr. Vivian or why Mr. Vivian signed the contract at issue in this case.

Defendant awarded the contract to Desbuild-REC on September 26, 2012, and plaintiff was notified of the award on the same day. Plaintiff and defendant held a telephone debriefing on October 1, 2012, with Mr. Krips and Project Manager for the Moscow project, PK Bagchi, representing the Department of State. Mr. Krips authored a memorandum for the file summarizing the phone call. During the debriefing, Caddell's CEO, Eddie Stewart, asked about Desbuild-REC's past experience and questioned how Desbuild-REC pre-qualified for the contract. Mr. Krips' memorandum stated: "I told him that the Desbuild-Renaissance[28] JV was prequalified, not Desbuild alone." Caddell also raised questions about Desbuild-REC's "similar construction work" for the purposes of Percy Amendment qualification. Mr. Krips' memorandum stated: "I told him that the Department of State Office of the Legal Advisor made all Percy qualifications, and that the technical panel had no input on this."

On October 5, 2012, plaintiff protested the award of the contract to Desbuild-REC at the GAO. Plaintiff raised four specific grounds in its protest at the GAO: 1) Desbuild-REC had not performed "similar construction work" for purposes of meeting the Percy Amendment requirements, 2) the award was made to a different entity than the entity that submitted the proposal,[29] 3) Desbuild-REC did not have sufficient technical experience to perform the contract, and 4) defendant misapplied the evaluation criteria by using adjective ratings as opposed to making a pass/fail determination for Phase I.[30] Desbuild-REC intervened in the GAO proceedings.

---

[28] REC is the parent company of two subsidiaries, 1) Renaissance Construction and Investment ZAO/Moscow, and 2) Renaissance Construction ZAO/St. Petersburg. Mr. Krips' reference to Renaissance, therefore, appears to be to REC.

[29] Plaintiff claimed that Desbuild-REC listed its address in its Phase I submission as Refik Galendir Sokak No: 110/1, Ankara, Turkey, but that defendant's September 26, 2012 letter to Desbuild-REC, awarding the contract to Desbuild-REC, was sent to 4744 Baltimore Avenue, Hyattsville, Md. 20781-2225. Plaintiff suggested that this established that award was made to a different entity than that which was pre-qualified in Phase I.

[30] Plaintiff argued that the Pre-qualification Notice stated that the pre-qualification factors would be evaluated on a pass/fail basis, but that, during plaintiff's debriefing, defendant indicated that Desbuild-REC's Phase I submissions "contributed to Desbuild - Renaissance's 'Excellent' rating for Phase II." Plaintiff argued that "[b]ecause Percy Amendment requirements and 'relevant project' information from Phase I was to be evaluated on a pass/fail basis only, any further comparison between the offerors' experience or assigning an adjective rating based on prior experience violates the Solicitation's stated evaluation criteria."

25

As part of the GAO record, defendant submitted a Department of State Agency Report dated November 5, 2012. The Department of State Agency Report tried to address the issue of defendant's initial determinations that Desbuild-REC failed Phase I Factor 2, Technical Project Experience, and was not eligible for the Percy Amendment price preference, as well as its subsequent reversals of both decisions.

Also contained in the GAO Record is a statement drafted after contract award, for the GAO proceedings, by defendant's Contract Specialist, Mr. Krips, regarding defendant's procurement process. Mr. Krips stated:

> The prequalification process is not the competitive RFP phase. The whole intent of this phase is to identify qualified potential offerors to promote competition. The prequalification process involves give and take and sometimes communications with potential offerors to seek clarifications or additional information. It is common and is not prohibited by the terms of our solicitations for the Department to consider information outside the prequalification submission in determining offeror eligibility under the Omnibus Diplomatic Security Act (22 U.S.C. [sic] 4852) and offeror eligibility for the Percy Amendment price preference.

Mr. Krips further indicated:

> It is also common for the Department [of State] to reconsider decisions to deny eligibility under 22 U.S.C. [sic] 4852 or price preference under the Percy Amendment when an adversely affected potential offeror requests reconsideration and supplies additional information.

> In the present case, the Department first reconsidered the experience of the Desbuild-REC International joint venture based on the overall experience of both joint venture partners, then reconsidered the Percy Amendment price preference eligibility of the joint venture based on Desbuild's performance on the [redacted] project. The [redacted] project is itself clearly a similar project and we determined that Desbuild's work on that project was substantial. As indicated in the [redacted] example,[31] there is absolutely no requirement that work as a minority joint venture partner be excluded from consideration.

At the GAO, defendant argued that plaintiff's GAO protest should be dismissed as untimely because plaintiff knew no later than April 30, 2012, before defendant issued the Phase II Solicitation, that Desbuild-REC had been pre-qualified and been designated a "U.S. Firm," and, thus, was eligible for a Percy Amendment price preference. Defendant argued that any protest challenging Desbuild-REC's eligibility for

---

[31] Elsewhere in his statement, Mr. Krips indicated that [redacted] was determined to be eligible for a construction project at the [redacted] based on its performance as a minority joint venture partner in a construction project at the [redacted].

26

Phase II had to be filed before submission of Phase II proposals. The GAO agreed and on January 7, 2013, the GAO issued a decision, finding that plaintiff's protest was untimely. The GAO stated: "Where a solicitation provides notice than an agency considers a particular firm to be eligible to compete, and a potential protestor believes the firm is ineligible, a protest must be filed before the next due date for submission of proposals." The GAO found that, because defendant had issued a list of pre-qualified "U.S. Firms" in April 2012, it should have been clear to plaintiff that Desbuild-REC would qualify for the Percy Amendment price preference. The GAO determined that publicly available information "(which was available to Caddell in April 2012) was sufficient to put Caddell on notice of its ground of protest." The GAO stated: "Because the agency announced that Desbuild-REC was considered to be a prequalified 'U.S. Firm' prior to the due date for phase 2 proposals, Caddell was required to protest Desbuild-REC's status as an American-owned firm under the Percy Amendment prior to this due date." The GAO dismissed plaintiff's protest as untimely because it was not filed until after the contract had been awarded to Desbuild-REC and because plaintiff's other grounds for protesting the contract award were, in the words of the GAO, "variations" of its Percy Amendment argument, or had been waived.

Plaintiff's counsel made several conflicting statements at oral argument before this court about when plaintiff found out that defendant had reversed its initial decisions to deny Desbuild-REC pre-qualification and a Percy Amendment price preference. Initially, plaintiff's counsel stated that plaintiff learned about its arguments regarding defendant's reversals at plaintiff's debriefing. Plaintiff's counsel then stated that plaintiff did not learn about defendant's reversal decisions "until we filed the GAO protest." From the record before the court, it appears that the first time plaintiff was informed that defendant had reversed itself on both Desbuild-REC's pre-qualification and Percy Amendment determinations was when it received the Department of State's Agency Report, dated November 5, 2012, as part of the GAO proceedings. Although it appears that Caddell asked defendant about Desbuild-REC's prequalification and Percy Amendment eligibility during plaintiff's debriefing, Mr. Krips indicated in his memorandum summarizing the debriefing that he only told Caddell that "Desbuild-Renaissance JV was pre-qualified, not Desbuild alone," and that "the Department of State Office of the Legal Advisor made all Percy qualifications." In addition, plaintiff did not raise the issue of defendant's reversal decisions before the GAO, which, presumably, it would have, had Caddell been aware of the Department of State's rapid reversals of two initial, eligibility determinations regarding the winning offeror.

Plaintiff filed a post-award bid protest in this court on January 20, 2013. Plaintiff challenges three decisions made by defendant during the procurement process as arbitrary, capricious, an abuse of discretion, and not in accordance with law and prejudicial to Caddell: 1) defendant's decision to pre-qualify Desbuild-REC, 2) defendant's decision to apply a ten percent, Percy Amendment price preference to Desbuild-REC's Phase II price proposal, and 3) defendant's decision to award the contract to Desbuild-REC. Plaintiff seeks: 1) injunctive relief,[32] 2) a declaratory

---

[32] Plaintiff's complaint seeks a preliminary injunction "requiring the United States to issue a stop work order on Desbuild-REC's performance of the Contract." Plaintiff's

27

judgment that awarding the contract to Desbuild-REC was contrary to law, 3) a declaratory judgment that defendant should terminate the existing contract with Desbuild-REC, 4) a declaratory judgment that plaintiff should be awarded the contract, 5) bid preparation and proposal costs, attorneys fees, and other costs, as well as 6) other relief that the court deems proper.  Defendant argues that the administrative record demonstrates that: 1) defendant reasonably determined that Desbuild-REC was pre-qualified to submit a Phase II proposal, 2) defendant reasonably determined that Desbuild-REC was eligible for a Percy Amendment price preference, and 3) defendant's award of the contract to Desbuild-REC was rational and supported by the record, as well as applicable law.

## DISCUSSION

### *Standing*

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491 (a)(1) (Supp. V 2011).  In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process.  See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332, 619 F.2d 892, 896 (1980))).  In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error.  See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Lab. Corp. of Am. v. United

---

motion for judgment on the administrative record, however, states that "the Court should permanently enjoin Desbuild-REC's performance of the Contact."

States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In the above captioned protest, defendant and intervenor do not challenge plaintiff's standing. Because it is a jurisdictional issue, however, the court briefly addresses whether plaintiff is an "interested party" to this contract. See USfalcon, Inc. v. United States, 92 Fed. Cl. 436, 451 (2010) ("Even though the government does not challenge USfalcon's standing, the Court finds it advisable that this jurisdictional question be explicitly determined."). Plaintiff was one of three offerors included in the final competitive range for the Moscow contract because, defendant found, each of those three offerors had "submitted acceptable technical proposals and competitive prices." Defendant's Technical Evaluation Board found that plaintiff's and Desbuild-REC's final proposals both earned a rating of "excellent," while the third offeror, FKE JV submitted a proposal that was rated "satisfactory." Defendant's Recommendation for Contract Award stated that plaintiff's and Desbuild-REC's offers were equally rated on technical factors, and that together they stood apart from the rest of the Phase II offers, although the Technical Evaluation Board had also stated Caddell's technical proposal should be rated slightly higher than Desbuild-REC's technical proposal. The Recommendation for Contract Awarded indicated that the reason Desbuild-REC's proposal was selected for contract award was its lower price. Stating that the Consensus Technical Rankings put Caddell and Desbuild-REC both at number one, with FKE JV ranked number two, the Recommendation for Contract Award concluded:

> In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price. Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.

From the record, it is clear that plaintiff's proposal was rated equally with, if not slightly better than, Desbuild-REC's on the technical criteria and that plaintiff's had the second-lowest, and relatively close, price of [redacted]. Had Desbuild-REC not been pre-qualified and, therefore, not been allowed to submit a Phase II proposal, or had Desbuild-REC not been eligible for a Percy Amendment price preference, plaintiff's Phase II offer likely would have been both the highest-rated and lowest-priced offer. Based on these facts, there was a substantial chance that plaintiff would have received the contract for the Moscow project, but for defendant's alleged procurement errors.

*Timeliness*

Desbuild-REC argues that plaintiff's claims should be dismissed as untimely because every claim plaintiff has filed with the court could have been raised as of April 30, 2012, the date on which defendant published a list of offerors that pre-qualified for the procurement and for a Percy Amendment price preference on FedBizOpps.

29

Intervenor asserts that, in <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, the United States Court of Appeals for the Federal Circuit established a waiver rule, under which a party who had the opportunity to object to an alleged flaw in an agency's solicitation before the close of the bidding process, but failed to do so, waives its ability to raise that same objection later in a bid protest in this court. <u>Id.</u> at 1313. Intervenor also argues that, in subsequent cases, this waiver rule has been extended to circumstances similar to those presented by the present case, citing <u>CRAssociates, Inc. v. United States</u>, 102 Fed. Cl. 698, 712 (2011), <u>aff'd</u>, 475 F. App'x 341 (Fed. Cir. 2012). According to intervenor, as of April 30, 2012, the date the List of PreQualified Firms-Moscow Annex was published on FedBizOpps, plaintiff knew that Desbuild-REC had been pre-qualified and had been granted a Percy Amendment price preference. Intervenor argues that plaintiff had sufficient information to either request a debriefing or file a protest at that time, but plaintiff chose to proceed to Phase II, and, thereby, waived its ability to raise its claims in this court subsequent to the award of the contract.

Plaintiff responds that when the FedBizOpps List of PreQualified Firms-Moscow Annex was published it did not know that both Desbuild-REC's past performance negative decision and Percy Amendment price preference denial had been reversed by the Department of State. Moreover, plaintiff argues that the waiver rule established in <u>Blue & Gold Fleet, L.P. v. United States</u> is limited to circumstances in which the party objects to "the terms of a government solicitation containing a patent error." Citing to <u>J.C.N. Construction, Inc. v. United States</u>, 107 Fed. Cl. 503, 516 (2012), plaintiff argues that <u>CRAssociates v. United States</u> does not create a broader waiver rule than <u>Blue & Gold Fleet, L.P. v. United States</u>. Plaintiff argues that the waiver rule cited by intervenor does not apply in this case because plaintiff is not challenging defendant's Solicitation, but rather challenges defendant's evaluation of Desbuild-REC's Phase I submission and defendant's award decision. Plaintiff maintains that it had no knowledge of, and could not have obtained, information that defendant had reversed its initial decisions on Desbuild-REC's pre-qualification or Desbuild-REC's Percy Amendment price preference eligibility until after plaintiff filed a protest at the GAO and received the Department of State's Agency Report, dated November 5, 2012. Also according to plaintiff, Caddell could not have requested a debriefing prior to the close of bidding because Caddell was still in consideration for the contract, and defendant could not have made available necessary information about Desbuild-REC's confidential proposal information. Therefore, according to plaintiff, it was impossible for plaintiff to challenge the agency's decisions any earlier than it did.

In <u>Blue & Gold Fleet, L.P. v. United States</u>, the plaintiff challenged the National Park Service's award of a contract to Hornblower Yachts, Inc. (Hornblower) for ferry services to Alcatraz Island. <u>See</u> <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1310-11. The plaintiff argued that Hornblower's proposal did not include employee wage and benefits information required by the Service Contract Act, thus making the Park Service's evaluation of the cost of Hornblower's proposal flawed. <u>See</u> <u>id.</u> at 1312. The solicitation, however, "did not include any requirement that the bidders consider the Service Contract Act," <u>id.</u> at 1313, and the plaintiff had not raised any objection to the exclusion of Service Contract Act requirements from the Solicitation prior to the

submission of proposals.  Therefore, the United States Court of Appeals for the Federal Circuit found that the plaintiff actually was challenging the terms of the solicitation, not the agency's evaluation of Hornblower's proposal.  See id. The Federal Circuit wrote:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Id.  The court reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*"  Id. (citing 28 § 1491(b)(3)) (emphasis in original).  Therefore, Blue & Gold Fleet, L.P. v. United States established a waiver rule, but one that only clearly applied to plaintiffs' challenges to the terms of a solicitation, not to challenges to alleged errors in an evaluation of offerors' submissions.

Intervenor argues that a subsequent case, CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, extends the waiver rule established in Blue & Gold Fleet, L.P. v. United States to the instant circumstances.  In CRAssociates, Inc. v. United States, the plaintiff challenged the Army's award of a contract for health care services to Spectrum HealthCare Resources (Spectrum).  See id. at 700.  The Army initially awarded the contract to Spectrum and Spectrum began performance.  Three months later, however, the plaintiff successfully challenged the contract award in this court.  Id. at 705-06.  The Army issued a stop work order, re-opened negotiations, both the plaintiff and Spectrum re-competed for the contract, and the Army selected Spectrum for contract award for a second time.  See id. at 706-09.  The plaintiff then filed a second bid protest, arguing that Spectrum had gained an unfair advantage in the second award competition from its three-month partial performance of the first contract.  See id. at 711.  The court explained that, when the plaintiff decided to re-compete for the contract, the plaintiff had requested that the Army amend the Request for Proposals to address Spectrum's alleged unfair advantage resulting from its partial performance of the contract.  The Army amended the Request for Proposals, but did not address plaintiff's request to reduce Spectrum's price by the amount it had already been paid.  The plaintiff, however, did not object to the Army's failure to adopt its suggested amendments to the Request for Proposals at the time, instead waiting until the contract had been awarded for a second time, then raising the Army's failure to modify Spectrum's price in the Court of Federal Claims.  Id. at 712.  The court found that the Blue and Gold Fleet, L.P. v. United States waiver rule applied in those circumstances because the plaintiff was essentially challenging the Army's failure to change the terms of the Request for Proposals.  The court stated: "Blue and Gold thus prevents a protester from raising *post-hoc* objections to the terms of a solicitation. Yet, that is precisely what CRA seeks to do here."  CRAssociates, Inc. v. United States, 102 Fed. Cl. at 712 (emphasis in original).  "[B]y holding its fire until after the contract was awarded to its competitor," the court ruled, the

31

plaintiff "waived its opportunity to raise issues concerning Spectrum's prior performance of the enjoined contract." Id. at 713.

CRAssociates, Inc. v. United States, therefore, did not expand the waiver rule established in Blue & Gold Fleet, L.P. v. United States; rather, the court found that, like the plaintiff in Blue & Gold Fleet, L.P. v. United States, the plaintiff in CRAssociates, Inc. v. United States actually was challenging the terms of the solicitation, rather than the agency's evaluation of proposals, and that a challenge to the terms of the solicitation had to be raised prior to the close of bidding. See CRAssociates, Inc. v. United States, 102 Fed. Cl. at 713. Moreover, the plaintiff in CRAssociates Inc. v. United States had knowledge of the issues regarding the Army's award of the contract to Spectrum before the award took place. As plaintiff argues, a subsequent case in the Court of Federal Claims also found that CRAssociates Inc. v. United States "concerned an offeror who failed to raise 'objections to the terms of a solicitation.'" See J.C.N. Constr., Inc. v. United States, 107 Fed. Cl. at 516 (quoting CRAssociates Inc. v. United States, 102 Fed. Cl. at 712). In J.C.N. Construction, Inc. v. United States, the court did not apply the waiver rule because "[u]nlike the offeror in CRAssociates, who had specific concerns about the terms of a second solicitation," the plaintiff's "claim that the Postal Service breached its duty to consider offerors' proposals fairly and honestly does not relate to patently inaccurate terms of Solicitation II." Id. This court agrees that CRAssociates, Inc. v. United States applied the waiver rule established in Blue & Gold Fleet, L.P. v. United States without broadening that rule in the way that intervenor argues.

In the above captioned case, defendant posted a List of PreQualified Firms–Moscow Annex on FedBizOpps on April 30, 2012. The list of pre-qualified offerors was divided into "U.S. Firms," and "Non-U.S. Firms." Plaintiff, Caddell, and Desbuild-REC were both included among six "U.S. Firms." Nine "Non-U.S. Firms" were also included on the list. Although designation as a U.S. Firm perhaps implied that those offerors had qualified for the Percy Amendment price preference, defendant's April 30, 2012 posting on FedBizOpps did not mention the Percy Amendment or indicate whether "U.S. Firms" had submitted "similar construction work" to qualify for the Percy Amendment price preference. More significantly, defendant's List of PreQualified Firms–Moscow Annex gave no indication that defendant had initially rejected, but subsequently reconsidered, Desbuild-REC's qualifications to proceed to Phase II of the procurement. Nor was there any indication at the time that defendant initially had found Desbuild-REC ineligible for the Percy Amendment price preference, but that the Department of State also had reconsidered the Percy Amendment determination. Instead, the "List of PreQualified Firms–Moscow Annex" posted on FedBizOpps simply listed Desbuild-REC International JV as a pre-qualified "U.S. Firm[]."

Defendant issued the Solicitation on May 18, 2012. After evaluating seven offerors' proposals, defendant established a competitive range and requested final proposals from three offerors: Caddell, Desbuild-REC, and FKE JV. Defendant notified plaintiff that Desbuild-REC had been awarded the contract on September 26, 2012. Plaintiff and defendant held a telephone debriefing on October 1, 2012. Mr. Krips

indicated in a memorandum summarizing the debriefing phone call that plaintiff asked about Desbuild-REC's pre-qualification. Mr. Krips wrote: "I told him [Caddell Chief Executive Officer Eddie Stewart] that the Desbuild-Renaissance JV was prequalified, not Desbuild alone." Plaintiff also raised questions about Desbuild-REC's Percy Amendment qualification, but Mr. Krips told plaintiff "that the Department of State Office of the Legal Advisor made all Percy qualifications, and that the technical panel had no input on this."

On October 5, 2012, four days later, plaintiff protested the award of the contract to Desbuild-REC at the GAO, and Desbuild-REC intervened. Defendant successfully argued at the GAO that plaintiff's protest should be dismissed as untimely because plaintiff allegedly knew before defendant issued the Solicitation that Desbuild-REC had pre-qualified and been found eligible for a Percy Amendment price preference. According to the GAO, from defendant's April 30, 2012 posting on FedBizOpps,

> it should have been clear to Caddell that the designated "U.S. Firms," including Desbuild-REC, would receive Percy Amendment price preferences under the solicitation. Caddell admits in its protest that publicly available information indicates that Desbuild-REC would not qualify as American-owned under the Percy Amendment and thus the firm should not have received the price preference. We find that this public information (which was available to Caddell in April 2012) was sufficient to put Caddell on notice of its ground of protest. The fact that Caddell learned of other information during a post-award debriefing to further demonstrate Desbuild-REC's ineligibility for the Percy Amendment price preference does not convert an otherwise untimely protest to a timely one. Because the agency announced that Desbuild-REC was considered to be a prequalified "U.S. Firm" prior to the due date for phase 2 proposals, Caddell was required to protest Desbuild-REC's status as an American-owned firm under the Percy Amendment prior to this due date. Because Caddell waited to file its protest until after award, we dismiss the protest as untimely.

This court respects the expertise of the GAO, and considers GAO decisions instructive. GAO decisions, however, are not binding on this court. See, e.g., Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. 226, 230 n.2 (2012) ("GAO decisions are not binding authority, but may be 'instructive in the area of bid protests.'" (quoting Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009))); see also Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. 35, 39 (2007) ("Decisions by the GAO are traditionally treated with a high degree of deference, especially in bid protest actions." (citing E.W. Bliss Co. v. United States, 33 Fed. Cl. 123, 135 (1995), aff'd, 77 F.3d 445 (Fed. Cir. 1996))). In the case currently before the court, the record does not establish that plaintiff had sufficient information to raise its claims prior to the submission of Phase II proposals. Moreover, plaintiff is not just challenging defendant's final decisions to qualify Desbuild-REC for Phase II and to award Desbuild-REC the Percy Amendment price preference. Plaintiff also is

challenging defendant's decision to reverse its initial determinations regarding Desbuild-REC's pre-qualification and Desbuild-REC's Percy Amendment price preference eligibility, as well as how defendant evaluated its final decision to award the contract to Desbuild-REC. Plaintiff did not know about defendant's initial determinations regarding Desbuild-REC's Phase I submission and defendant's reversal of both decisions until after plaintiff filed its protest at the GAO and received defendant's Agency Report on November 5, 2012. According to the administrative record filed in this court, defendant's November 5, 2012 Agency Report was the first document that addressed the fact that defendant initially had assigned Desbuild-REC a failing mark on Factor 2 of the pre-qualification submission, Technical Project Experience and Past Performance, and initially had told Desbuild-REC that it did not qualify for the Percy Amendment price preference, but subsequently reversed both of those determinations. Because defendant's reversal of its initial determinations regarding Desbuild-REC's pre-qualification for Phase II and Desbuild-REC's Percy Amendment eligibility, as well as defendant's trade-off analysis, are at issue in the case before the court, and because plaintiff was not aware of defendant's reversals until November 2012, the court finds that plaintiff did not have all of the necessary information to raise its claims as of April 2012, as alleged by defendant.

The court also notes that plaintiff is not challenging the terms of defendant's Pre-qualification Notice or Solicitation. Unlike in Blue & Gold Fleet, L.P. v. United States, plaintiff does not object to the contents of defendant's Pre-qualification Notice or Solicitation. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1310. In addition, unlike in CRAssociates, Inc. v. United States, which also included a challenge to the terms of a solicitation, plaintiff did not have knowledge of the basis for its claims until after contract award. See CRAssociates, Inc. v. United States, 102 Fed. Cl. at 712. Plaintiff instead challenges decisions that defendant made in evaluating Desbuild-REC's Phase I submission and in awarding the contract to Desbuild-REC. Because plaintiff is not challenging the terms of defendant's Pre-qualification Notice or the Solicitation, but rather defendant's evaluation of Desbuild-REC's pre-qualification submissions and defendant's award decision based on those submissions, the Blue & Gold Fleet, L.P. v. United States waiver rule and CRAssociates, Inc. v. United States interpretation of that rule do not apply. Plaintiff's protest filed in this court is timely.

### Standard of Review

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2012), which governs motions for judgment on the Administrative Record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2006)), amended the Tucker Act to establish a statutory basis for bid protests in the

United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing to Scanwell Laboratories, Inc. v. Shaffer for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by disappointed bidders, such as the plaintiff in Scanwell."), cert. denied, 534 U.S. 1113 (2002). The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (quoting 41 U.S.C. § 403(2))); see also Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006);[33] see

---

[33] The language of 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

also <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013); <u>COMINT Sys. Corp. v. United States</u>, 700 F.3d 1377, 1381 (Fed. Cir. 2012); <u>Savantage Fin. Servs. Inc., v. United States</u>, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352, 1358 (Fed. Cir. 2009); <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332); <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1312 ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2011); <u>see</u> <u>also</u> <u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that

---

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically has addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A). See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform a meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court has also cautioned, however, that "courts are not free to impose upon agencies specific

procedural requirements that have no basis in the APA." <u>Pension Benefit Guar. Corp. v. LTV Corp.</u>, 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. <u>See</u> <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d 990, 995-96 (Fed. Cir. 1996); <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 340; <u>Textron, Inc. v. United States</u>, 74 Fed. Cl. at 285; <u>Labat-Anderson Inc. v. United States</u>, 50 Fed. Cl. 99, 106 (2001); <u>Emery Worldwide Airlines, Inc. v. United States</u>, 49 Fed. Cl. 211, 222, <u>aff'd</u>, 264 F.3d 1071 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2001); <u>Dynacs Eng'g Co. v. United States</u>, 48 Fed. Cl. 614, 619 (2001); <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. 388, 392 (1999), <u>dismissed</u>, 6 F. App'x 867 (Fed. Cir. 2001). The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." <u>PAI Corp. v. United States</u>, 614 F.3d at 1352 (citing <u>John C. Grimberg Co. v. United States</u>, 185 F.3d 1297, 1300 (Fed. Cir. 1999); <u>C.A.C.I., Inc.-Fed. v. United States</u>, 719 F.2d 1567, 1581 (Fed. Cir. 1983); <u>Filtration Dev. Co., LLC v. United States</u>, 60 Fed. Cl. 371, 380 (2004)).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions, <u>see</u> 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."), perhaps duplicative, although this analysis is technically different from the standing analysis. <u>See</u> <u>Linc Gov't Servs., LLC v. United States</u>, 96 Fed. Cl. at 694-96 (2010). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

<u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. <u>See</u> <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996); <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." <u>Data General</u>, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial

38

chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999) (citation omitted in original); see also Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562)); see also Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. at 96 (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007); Park Tower Mgmt., Ltd. v. United States, 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); see also R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003) (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United

<u>States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002); <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985))).

> According to the United States Court of Appeals for the Federal Circuit:
>
> Effective contracting demands broad discretion. <u>Burroughs Corp. v. United States</u>, 617 F.2d 590, 598 (Ct. Cl. 1980); <u>Sperry Flight Sys. Div. v. United States</u>, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); <u>see</u> <u>NKF Eng'g, Inc. v. United States</u>, 805 F.2d 372, 377 (Fed. Cir. 1986); <u>Tidewater Management Servs., Inc. v. United States</u>, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); <u>RADVA Corp. v. United States</u>, 17 Cl. Ct. 812, 819 (1989), <u>aff'd</u>, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." <u>Tidewater Management Servs.</u>, 573 F.2d at 73, 216 Ct. Cl. 69.

<u>Lockheed Missiles & Space Co., Inc. v. Bentsen</u>, 4 F.3d at 958-59; <u>see</u> <u>also</u> <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d at 995; <u>Grumman Data Sys. Corp. v. Widnall</u>, 15 F.3d 1044, 1046 (Fed. Cir. 1994); <u>Cybertech Grp., Inc. v. United States</u>, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); <u>Lockheed Missiles & Space Co. v. United States</u>, 4 F.3d at 958; <u>JWK Int'l Corp. v. United States</u>, 49 Fed. Cl. 371, 388 (2001), <u>aff'd</u>, 279 F.3d 985 (Fed. Cir), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2002).

> Similarly, the Federal Circuit further has indicated that:
>
> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

<u>PAI Corp. v. United States</u>, 614 F.3d at 1351; <u>see</u> <u>also</u> <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d at 1354 (quoting <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058))).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation." (footnote omitted)); see also Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions are "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))). This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise . . . . is entitled to the greatest possible deference under E.W. Bliss"); Dismas Charities, Inc. v. United States, 61 Fed. Cl. 191, 203 (2004) ("The decision as to whether an offeror should have scored a 3, 4, or 5 on any question is properly left to the discretion of the agency."). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct. See, e.g., WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))).

The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others. For example, in a negotiated procurement, contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (citations omitted)); see also Hayes Int'l Corp. v. United States, 7 Cl. Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." (citing Sperry Flight Sys. v. United States, 212 Ct. Cl. 329, 339-40, 548 F.2d 915, 921 (1977))).

The Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing E.W. Bliss Co. v. United States, 77 F.3d at

449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002), reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 937 (2003); E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958; cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is 'grounded in reason... even if the Board itself might have chosen a different bidder')...."); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012). D & S Consultants identifies another circumstance in which the contracting officer is afforded yet greater discretion. The court in D & S Consultants explained, procurements in which a best-value determination is made afford the contracting officer broader decision making discretion than a negotiated procurement in which a best-value determination is not at issue. See id.; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co.

v. Bentsen, 4 F.3d at 958-59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

Plaintiff argues that defendant made three decisions that were arbitrary, capricious, contrary to law, and prejudicial to Caddell: 1) the decision to pre-qualify Desbuild-REC and allow Desbuild-REC to submit a Phase II offer, 2) the decision to grant Desbuild-REC a ten percent, Percy Amendment price preference, and 3) the decision to award the contract for the Moscow project to Desbuild-REC. Plaintiff alleges that defendant's decisions to pre-qualify Desbuild-REC and to grant Desbuild-REC the Percy Amendment price preference were arbitrary and capricious because they lacked a rational basis, were undocumented, and contradicted information contained in the administrative record. According to plaintiff, defendant's decision to award the contract to Desbuild-REC was arbitrary and capricious because the evaluation was based on the two previous erroneous decisions to pre-qualify Desbuild-REC and to grant Desbuild-REC a Percy Amendment price preference. Defendant and intervenor respond that the administrative record establishes that defendant reasonably determined that Desbuild-REC was qualified to compete for the contract and entitled to the Percy Amendment price preference, and that defendant's decision to award the contract for the Moscow project to Desbuild-REC was reasonable and correct.

Two of plaintiff's challenges, regarding Desbuild-REC's pre-qualification and Desbuild's Percy Amendment eligibility, concern determinations that defendant made during Phase I of the procurement process at issue, the purpose of which was to determine eligibility to participate in the competition for the contract once the Solicitation was issued and to determine an offerors' eligibility for a price preference. Defendant asserts that the FAR provisions governing an agency's evaluation of bid proposals do not govern pre-qualification determinations and even asserts that the pre-qualification phase is not part of the procurement. Defendant and intervenor also suggest that Phase I of this procurement proceeding should be judged by the standards used to review determinations of responsibility. Defendant cites a GAO decision, Caddell Construction Company, Inc., B-298949.2, 2007 WL 1893209, at *11 n.3 (Comp. Gen. June 15, 2007), claiming that, in similar circumstances to the instant case, the GAO found that "offeror's submission of pre-qualification materials was more analogous to matters of responsibility than to question of the proposal's acceptability." With regard to the standard of review applied to responsibility determinations, defendant cites Tech Systems, Inc. v. United States, 98 Fed. Cl. 228, 266 (2011), for the proposition that "[c]ontracting officers enjoy 'wide discretion' in making responsibility determinations and deciding how much information is required to do so." Furthermore, defendant asserts that agencies are not required to explain an affirmative determination of responsibility

44

unless the record suggests arbitrary and capricious action. Intervenor also raised for the first time at oral argument an argument that defendant's Phase I evaluations were akin to competitive range determinations. In this regard, the court notes that the Federal Circuit has held that "[a] contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 973 (Fed Cir. 1993).

In the 2007 Caddell GAO protest, cited by defendant, the Department of State had awarded a contract for design and construction of a new United States Embassy in Djibouti to American International Contractors (Special Projects), Inc. (AICI–SP). See Caddell Constr. Co., Inc., 2007 WL 1893209. Caddell Construction Company, Inc. protested the award based on the fact that the solicitation was subject to the Omnibus Diplomatic Security and Antiterrorism Act of 1986, codified at 22 U.S.C. § 4852 (2006), which provided that only "United States persons" and "qualified United States joint venture persons" were eligible to compete for the contract. Caddell argued that AICI–SP was not qualified as a "United States person." Caddell Constr. Co., Inc., 2007 WL 1893209, at *1. The GAO sustained the protest. The Department of State then sought additional information from AICI–SP to determine if it could qualify under the Omnibus Diplomatic Security and Antiterrorism Act of 1986, and, again, concluded that AICI-SP was qualified. Caddell filed a second protest, challenging both defendant's "decision to allow AICI–SP to submit a revised pre-qualification statement, and its conclusion that the company meets the requirements of the Act." Id. at *4. In the passage defendant cites, the GAO stated:

> We do not agree with Caddell's argument that the agency improperly engaged in discussions by requesting, and allowing, AICI–SP to submit revised prequalification materials. The prequalification materials at issue here were submitted prior to proposals, and were used to determine eligibility to participate in the competition. As such, these materials are more analogous to matters of responsibility, than to questions of the proposal's acceptability—as Caddell argues. We have specifically held that an agency properly may obtain information from a contractor regarding its responsibility at any time until award is made. Dock Express Contractors, Inc., B–227685.3, Jan. 13, 1988, 88–1 CPD para. 23 at 6.

Id. at *11 n.3.

Plaintiff responds that there was no indication in the administrative record that defendant considered Phase I a kind of "elongated responsibility determination." But, according to plaintiff, even if the Phase I pre-qualification evaluation somehow was akin to a responsibility determination, defendant's determinations to permit Desbuild-REC to submit a Phase II proposal and to qualify Desbuild-REC for a Percy Amendment price preference must have a rational basis and be supported by the administrative record. Moreover, plaintiff maintains that if the Phase I determinations were akin to responsibility determinations, defendant was required to document a reasonable explanation of its decisions at the time because defendant's back-to-back contradictory

45

decisions regarding Desbuild-REC's qualifications are indicia of irregularity, which, as defendant concedes, trigger a need for an affirmative rationale.

Pre-qualification decisions that are allegedly arbitrary and capricious or violate a statute or regulation should be reviewed under the APA standard of review because they are made "in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), which "'includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" See Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381 (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244)). That the APA standard of review applies to pre-qualification decisions is evidenced by the subsequent history of the Caddell, Djibouti, GAO protest decision on which defendant relies. After the Department of State withdrew the original contract awardee's pre-qualification in response to the GAO's decision in Caddell Construction Company, Inc., 2007 WL 1893209, the original contract awardee brought a bid protest in the United States Court of Federal Claims, maintaining that the Department of State's subsequent decision to withdraw the contractor's pre-qualification was "irrational, arbitrary, and capricious." See Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. at 36. A Judge of this court applied the APA standard of review to issues regarding the pre-qualification determination, concluding that the Department of State's subsequent withdrawal of the winning contractor's pre-qualification was "irrational, arbitrary, capricious, and not in accordance with law." Id. at 37.

Defendant is correct that the United States Court of Appeals for the Federal Circuit has recognized that contracting officers are afforded wide discretion in making responsibility determinations and the amount of information required to make responsibility determinations, but the Federal Circuit has incorporated a recognition of this discretion as part of the APA standard of review. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1334-35 (recognizing that "Contracting officers are 'generally given wide discretion' in making responsibility determinations" but applying the APA's standards to review the contracting officer's responsibility determination) (quoting John C. Grimberg Co. v. United States, 185 F.3d at 1303); see also Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002). The Federal Circuit similarly has indicated that a contracting officer's determination of a competitive range should not be "not disturbed unless clearly unreasonable,'" see Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1136 (Fed. Cir. 1998) (quoting Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d at 973), and Judges of the United States Court of Federal Claims have incorporated this guidance into the traditional, APA standard of review. See Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 574, 585 (2010); Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 339, 341 (2000), aff'd, 10 F. App'x 957 (Fed. Cir. 2001). The extent to which the discretion afforded to a contracting officer is incorporated into the APA standard of review directly relates to the extent that applicable statutes and regulations prescribe a particular course of conduct. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'In formally advertised bidding the pertinent statutes and regulations are

46

far more strict about the conduct of the procurement than in a negotiated one, consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion.'" (quoting Burroughs Corp. v. United States, 223 Ct. Cl. 53, 65, 617 F.2d 590, 598 (1980))); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379 ("[I]n a negotiated procurement . . . this court has held that the regulations entrust the contracting officer with especially great discretion . . . ."); L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 650 (2008) ("The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary and capricious…. '[B]est value' contract awards give a contracting officer more discretion than awards based on price alone. . . .' The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."), appeal dismissed, 356 F. App'x 390 (Fed. Cir. 2009).

Contracting officers are afforded wide discretion to make responsibility determinations "[b]ecause responsibility decisions are largely a matter of judgment." See John C. Grimberg Co. v. United States, 185 F.3d at 1303 (citing Trilon Educ. Corp. v. United States, 217 Ct. Cl. 266, 270–271, 578 F.2d 1356, 1358, reh'g denied, 1978 WL 14872 (Ct. Cl. Sept. 29, 1978)). The court recognizes, therefore, that "'[t]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.'" Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. at 64, 617 F.2d at 597). That the amount of discretion afforded to an agency under applicable statutes and regulations is considered by the court when determining the validity of an alleged error in the procurement process, however, does not indicate that the court should deviate from the APA standard of review that is otherwise generally applicable in bid protests. Although the court is required to take into account the amount of discretion afforded to the agency under applicable statutes and regulations, the APA standard of review applies to pre-qualification decisions. See 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). In reviewing defendant's Phase I and Percy Amendment eligibility decisions, this court will apply the traditional APA bid protest standard to the facts of this case.

### Pre-qualification

Plaintiff argues that defendant's decision to pre-qualify Desbuild-REC and allow intervenor to submit a proposal in Phase II of the procurement, after initially disqualifying the Joint Venture from doing so, was arbitrary and capricious and lacked a rational basis in the record. Plaintiff argues that defendant's failure to articulate any explanation for reversing its original decision and that the issuance of a final decision which contradicted its own contemporaneous record was arbitrary and capricious.

Defendant's initial determination, announced in defendant's April 6, 2012 letter to Desbuild-REC, was that Desbuild-REC had failed Factor 2, Technical Project Experience and Past Performance, and could not proceed to Phase II of the

47

procurement, because both joint venture partners were required to submit examples of "relevant projects." According to defendant's initial decision, while REC had done so and qualified, defendant concluded that Desbuild's submitted projects "do not qualify as relevant projects." Paragraph 2A.2 of the Pre-qualification Notice defines relevant projects as: "those projects similar in scope, complexity and dollar value (USD) in that order of importance." The reversal of the Department of State's original decisions occurred after defendant received Desbuild-REC's April 9, 2012 letter, which did not submit any new substantive information, but which argued that the Pre-qualification Notice in fact required joint venture partners to submit at least one example of a project that was "relevant to demonstrate technical project experience for the partners' proposed role in the Project." Desbuild-REC argued that "Desbuild's role would be limited to certain management functions," thus implying that Desbuild did not need to demonstrate experience on a prior project as large as the Moscow project. Desbuild-REC also emphasized that the Pre-qualification Notice stated: "For offerors who do not have individual projects representative of the project scope and complexity, DOS will evaluate the technical project experience demonstrated by the combined project examples." Desbuild-REC asked defendant to explain why "the combined project examples submitted by Desbuild-REC did not meet the agency's requirements."

After receiving Desbuild-REC's April 9, 2012 letter, defendant's Contracting Officer, Mr. Powell, responded by letter on April 13, 2012. Mr. Powell's letter stated: "[O]ur prequalification panel went through an extensive reevaluation of the package that you have submitted. Following careful consideration, the panel has determined that the Desbuild-REC JV is qualified to continue on to the bidding process due to the cumulative experience of the JV members." No additional explanation or discussion of the "extensive reevaluation" or "careful consideration" or of why the Department of State changed its mind was offered. Nor are any additional records of meetings or conversations by those involved in the pre-qualification decision included in the record. Nor is it clear why Mr. Powell wrote to defendant on April 13, 2012, when, up until that point, defendant's Contract Specialist, Mr. Krips, had handled all communication with the offerors. And, there is no documented further communication between Mr. Powell and Mr. Krips during the reconsideration time.

Plaintiff and defendant disagree on what requirements the Pre-qualification Notice established for offerors to satisfy Subfactor 2A, Technical Project Experience. Plaintiff argues that the Pre-qualification Notice required each offeror, including individual partners within a joint venture, to qualify separately under Subfactor 2A. According to plaintiff, "[t]he requirement that each partner submit evidence of its technical capabilities shows that the capabilities of one partner to the joint venture could not be attributed to the other partner. Instead, each partner was required to demonstrate technical experience – similar in size, scope, and complexity – to its stated role." Because Desbuild was proposed as a [redacted] percent majority partner on the Moscow project, plaintiff asserts that Desbuild "was required to submit one to two projects relevant to demonstrate its ability to perform approximately [redacted] of a $156 million construction Contract." Desbuild submitted a [redacted]. According to plaintiff, defendant's initial decision that neither of Desbuild's submitted projects was "relevant"

48

to Desbuild's proposed role in the Moscow project was a reasonable decision, as the [redacted] projects were substantially smaller than [redacted] percent of the Moscow project and the Pre-qualification Notice required that each joint venture partner qualify individually by submitting projects "relevant to demonstrate technical project experience for the partners' proposed role in the Project." Therefore, according to plaintiff, defendant's initial decision that Desbuild-REC failed Factor 2 because Desbuild failed to submit any "relevant" projects was consistent with the terms of the Pre-qualification Notice.

Defendant disagrees and suggests that the Pre-qualification Notice did not require both members of a joint venture to qualify separately under Subfactor 2A, Technical Project Experience, but rather permitted defendant to consider the combined technical experience of proposed joint venture partners. Defendant argues that Paragraph 2A.4 of the Pre-qualification Notice, JV Project Examples, does not define the term "relevant projects," and that the plain meaning of the Pre-qualification Notice supports its position. Instead, Paragraph 2A.4 requires, for joint ventures, that each partner submit "at least one, but no more than two, example of projects that are relevant to demonstrate technical project experience for the partners' proposed role in the Project."

Defendant also emphasizes that the Pre-qualification Notice states: "**DOS will evaluate the Offeror's technical project experience in executing relevant projects. For Offerors who do not have individual projects representative of the project scope and complexity, DOS will evaluate the technical project experience demonstrated by the combined project examples**." (emphasis in original). Defendant argues that, for offerors organized as joint ventures, the "combined project examples" provision allowed defendant to consider the "combined project examples" of all the joint venture partners for each proposal and determine if the joint venture could qualify based on the cumulative technical experience of all partners.

In this court, defendant now characterizes its initial decision not to pre-qualify Desbuild-REC because of Desbuild's apparently insufficient "relevant projects" as a mistake, based on an incorrect interpretation of its own Pre-qualification Notice. Defendant's April 6, 2012 letter to Desbuild-REC, indicating that it was not pre-qualified to proceed to Phase II, stated: "Evaluation factor 2A.4 (JV Project Examples) requires that each partner must show examples of project(s) that are similar in scope, complexity and dollar value of the Moscow project. The Desbuild projects in [redacted] do not qualify as relevant projects." According to defendant, the Department of State appears to have initially maintained that both joint venture partners had to submit "relevant projects" and satisfy Subfactor 2A individually. Defendant now argues that defendant had the authority to correct this initial conclusion and reconsider Desbuild-REC's pre-qualification submission. After a reevaluation, defendant contends, defendant's April 19, 2012 letter to Desbuild-REC more correctly concluded that "the Desbuild-REC JV **is** qualified to continue on to the bidding process due to the cumulative experience of the JV members." (emphasis in original).

Although the Pre-qualification Notice uses broad language, allowing the Department of State to "evaluate the technical project experience demonstrated by the combined project examples" in the submissions of joint venture partners, defendant's rapid reversal of its initial decision to fail Desbuild-REC on Factor 2, Technical Project Experience and Past Performance, warranted an explanation in the record. Plaintiff objects to Desbuild's submitted "relevant projects" based on their significantly lower dollar value and complexity, as compared to the Moscow project. Plaintiff does not take issue, however, with the "relevant" status of REC's submitted projects. Although Subfactor 2A of the Pre-qualification Notice, Technical Project Experience, may have allowed defendant to consider Desbuild's and REC's "combined project examples," the record is surprisingly sparse as to the information defendant reviewed in reversing its initial decision and deciding that Desbuild-REC should be pre-qualified. Despite defendant's statement in its April 13, 2012 letter to Desbuild-REC that it had conducted an "extensive reevaluation of the package" submitted, and reversed its decision "following careful consideration," it is not clear from the record what information defendant reviewed again or what convinced the Department of State personnel to reverse its original decision not to pre-qualify the Desbuild-REC Joint Venture, and instead to pre-qualify Desbuild-REC based on the combined project examples recently submitted.

As discussed above, to demonstrate the Joint Venture's technical experience under Subfactor 2A, Desbuild-REC's Phase I submission listed two projects for Desbuild and three projects for REC. Desbuild-REC submitted as a relevant project a [redacted], for which Desbuild was the sole contractor. Desbuild-REC indicated that:

[redacted]

Desbuild-REC also submitted as relevant a renovation project at the [redacted], valued at [redacted], for which Desbuild was also the sole contractor. Desbuild-REC indicated that the [redacted] project was relevant to the Moscow project because:

[redacted]

Desbuild-REC's Phase I submission listed three[34] separate projects to establish REC's technical experience: 1) [redacted], valued at [redacted]; 2) the construction of the [redacted], valued at [redacted]; and 3) the "Design & Build" of [redacted], valued at [redacted]. Plaintiff has not contested the adequacy of REC's "relevant projects."

---

[34] The Pre-qualification Notice instructed offerors organized as joint ventures to "submit, for each partner, at least one, but no more than two, example of projects that are relevant to demonstrate technical project experience for the partners' proposed role in the Project." (emphasis in original). Desbuild-REC submitted three projects for REC. Defendant made no mention in the administrative record of the fact that Desbuild-REC failed to follow instructions regarding the number of relevant project examples submitted, nor did defendant ever address whether it took all three of REC's examples into consideration in pre-qualifying the Joint Venture, or whether it disregarded one of the projects.

Similarly, the projects submitted by Caddell, including 1) the construction of a new office building at the United States Embassy in [redacted], valued at [redacted], 2) the design/build of a United States Embassy Complex in [redacted], valued at [redacted], and 3) the design/build of a new Embassy compound in [redacted], valued at [redacted], were accepted by defendant as "relevant projects" and are not at issue here.

Although there may be a rationale by which the Pre-qualification Notice establishes that defendant could consider Desbuild-REC's combined project experience, the unexplained, undocumented and rapid reversal after Desbuild-REC's April 9, 2012 letter, accompanied by only a bald assertion that "extensive reevaluation" and "careful consideration" had occurred, without further explanation, raises questions of whether defendant acted in an arbitrary and capricious fashion. The record reflects no additional evaluation and the court is left with an unexplained, undocumented reversal, not buttressed by any justification.

Although plaintiff conceded at oral argument that the "combined project examples" language may have been sufficient grounds for a decision to pre-qualify Desbuild-REC,[35] the court has no way to judge the validity of defendant's rationale for

---

[35] Plaintiff's counsel stated, with regard to defendant's decision to pre-qualify Desbuild-REC:

> Counsel: So we can see an explanation how they got to the original decision to deny, but we have absolutely no explanation for how they came to the decision to reverse. Right, wrong or indifferent they came to a decision, and we're not arguing that if the original decision had been to prequalify on the basis of the same facts. If the original decision had been to prequalify them based on the same projects, I don't think our argument would be strong.
>
> Court: So you are saying that that could have been a legitimate decision?
>
> Counsel: It could have, but they made a decision and they documented how they made the decision, and then they reversed that decision without explaining how or why.
>
> Court: Well, let me ask you then again, you're saying that there would have been sufficient grounds in the record for the State Department to have made the prequalification decision they made the second time and to have made the Percy Amendment decision they ultimately made?
>
> Counsel: I think on the prequalification decision, yes, because I think if they had come up with a rationale along the lines of even though the [redacted] project is only X dollars and even though the [redacted] project is only Y dollars –
>
> Court: So you just conceded that argument?

51

overturning its initial decision that Desbuild-REC did not pre-qualify and why that decision was reversed.  Based on the lack of explanation or any indication of the basis for defendant's reversal, the court has no way of knowing whether, when making its second decision, defendant properly considered whether Desbuild-REC had submitted projects "relevant to demonstrate technical project experience <u>for the partner's proposed role</u> in the project." (emphasis added).  In general, procurements by the federal government, with few exceptions such as national security, not involved here, are expected to be conducted with transparency and in an environment which treats all offerors fairly and equally.  See <u>Banknote Corp. of Am. v. United States</u>, 56 Fed. Cl. 377, 383 (2003) ("[I]t is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." (citing <u>Seattle Sec. Servs. Inc. v. United States</u>, 45 Fed. Cl. 560, 569 (1999))), <u>aff'd</u>, 365 F.3d 1345 (Fed. Cir. 2004); <u>see</u> <u>also</u> <u>Chenega Mgmt., LLC v. United States</u>, 96 Fed. Cl. at 585.

As noted above, plaintiff and defendant disagree over what information defendant was allowed to consider in evaluating Phase I submissions.  The parties also are at odds over whether, when defendant reversed its earlier decisions, the Department of State provided a sufficient rationale for its reversal, and whether defendant was required to provide additional documentation of its "extensive reevaluation" and "careful consideration" of Desbuild-REC's Phase I submission.  Plaintiff points out that Desbuild-REC's April 9, 2012 letter to defendant, requesting reconsideration of Desbuild-REC's pre-qualification, directly contradicted Desbuild-REC's Phase I submission by stating repeatedly that Desbuild would have a "limited role" in the Moscow project.  According to plaintiff, defendant failed to reconcile the inconsistencies between Desbuild-REC's Phase I submission and Desbuild-REC's subsequent April 9, 2012 letter to defendant.  Plaintiff asserts  that defendant's April 13, 2012 letter to Desbuild-REC was a decision reversal, allowing Desbuild-REC to continue on to Phase II of the bidding process, but failed to include any support for that decision or to reconcile the differences between Desbuild-REC's Phase I submission, which presented Desbuild as the [redacted] percent majority partner of the Joint Venture, and intervenor's April 9, 2012 letter, which argued that Desbuild's role "would be limited to certain management functions."  Plaintiff argues that defendant's decision reversal and representation in its April 13, 2012 letter that defendant "went through an extensive reevaluation" of Desbuild-REC's Phase I submission is not supported in the administrative record before the court.   Plaintiff alleges that, although defendant indicated that it had conducted an "extensive reevaluation," defendant did not describe when, how, or which pre-qualification panel members agreed to the reversal, or what

Counsel: …  I am for the purpose of the prequalification argument.  I am not for the purpose of the Percy Amendment because the Percy Amendment has a totally separate problem associated with it.

In addition, asked specifically about the "combined project examples" provision of the Pre-qualification Notice, plaintiff's counsel said: "This is why I explained that I think they [defendant] could have made the decision they did on the prequalification…."

information defendant learned in the intervening seven days, between disqualifying Desbuild-REC on April 6, 2012 and reversing its decision on April 13, 2012. Plaintiff questions whether defendant, in fact, even performed a reevaluation. Thus, plaintiff concludes, "[b]ecause Mr. Powell's April 13, 2012 decision contradicts DOS's April 6, 2012 decision, and does not attempt to reconcile the contradiction or explain a reasoned basis for the agency's reversal, DOS's decision lacks a rational basis."

Defendant and intervenor agree that Desbuild-REC's April 9, 2012 letter to defendant did not contain any new factual information beyond what was provided in Desbuild-REC's earlier Phase I submission, and that, when reconsidering the decision to disqualify Desbuild-REC, defendant reviewed Desbuild-REC's original Phase I submission. Defendant maintains that the administrative record supports defendant's reversed decision to pre-qualify Desbuild-REC based on the combined experience of the Joint Venture and that the final decision to do so was reasonable. Defendant acknowledges that there are no contemporaneous notes or other written evidence of any reevaluation proceedings, but, defendant argues, there is no requirement for such documentation. Defendant also points to: 1) the Pre-qualification Notice, which, according to defendant, allowed a joint venture offeror to pre-qualify based on the combined project experience of both joint venture partners; 2) the Pre-qualification Review Board's "Initial Recommendation" as to which contractors should pre-qualify, which according to defendant demonstrated that Desbuild-REC's pre-qualification rejection was a very close call; and 3) defendant's April 13, 2012 letter to Desbuild-REC, which subsequently determined that Desbuild-REC pre-qualified for the contract. Defendant asserts that there are no FAR provisions, other regulations, or language in the Pre-qualification Notice which prevented defendant from communicating with Desbuild-REC during the pre-qualification phase, nor from re-evaluating Desbuild-REC's Phase I submission. At oral argument, as discussed above, defendant added that defendant's earlier failure to consider the combined projects, as communicated to Desbuild-REC in the April 6, 2012 letter, was a mistake.

Defendant also argues that the presumption in favor of the regularity of executive branch, administrative decisions should apply. The court acknowledges the existence of a generic "presumption of regularity." See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1338 (citing Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626–27 (1986); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 n.9; United States v. Chem. Found., Inc., 272 U.S. 1, 14–15 (1926)); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting." (citing Torncello v. United States, 681 F.2d 756, 770 (1982); Librach v. United States, 147 Ct. Cl. 605, 1959 WL 7633 (1959)). Notably, even if "'[t]he agency's decision is entitled to a "presumption of regularity," [] that presumption does not shield it from a "thorough, probing, in-depth review."'" Mark Dunning Indus., Inc. v. United States, 64 Fed. Cl. 374, 377 (2005) (quoting Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 231 (1997) (quoting Citizens to Pres. Overton Park v. Volpe, 401 U.S. at 415.)). In the case before the court, the rapid, unexplained reversal on Desbuild-REC's pre-qualification decision and of the intervenor's Percy Amendment price preference eligibility, discussed more fully

below, cause this court to reject the presumption as a way to bolster the defendant's decision. Enough questions are raised by the Department of State's actions to force the defendant to its proof. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1338 (noting that the presumption of regularity can be rebutted upon a showing that the agency may have acted in an arbitrary and capricious manner). The multiple reversals of its initial decisions, first not to pre-qualify Desbuild-REC for Phase II of the procurement, and as discussed below, not to grant Desbuild-REC the ten percent, Percy Amendment price preference, each made without explanation or documentation, and only shortly after an opposite, initial decision was made, is sufficient to rebut the presumption. These were not regular or transparent proceedings. The absence of the presumption of regularity does not mean that plaintiff automatically prevails, but defendant cannot rely on the presumption to buttress its defense.

As indicated above, the administrative record contains no documents explaining what occurred between the Department of State's decision not to qualify Desbuild-REC for the Phase II competition and its reversal of that decision seven days later, and defendant and intervenor concede no such documents exist. In the Pre-qualification Review Board's April 4, 2012 Initial Recommendation, all four panel members voted "Failed," regarding passing the Desbuild-REC Joint Venture on to Phase II. The following narrative was included by way of explanation of the decision to not pre-qualify Desbuild-REC:

> **DesBuild - REC International JV (JV)**
> Factor 1 Joint Venture Agreement and Description of Partnership    PASS
> Factor 2 Technical Project Experience and Past Performance         FAIL
> REC has done projects of similar and greater complexity than the Moscow NOX. However, the panel was concerned that Desbuild does not show sufficient experience in handling a project of this size based upon the examples provided in the prequalification package (examples provided include [redacted]). Contractor mentioned some performance problems that were, apparently, caused by the client. Initially, three of the 4 team members gave the JV a "passing mark" in this category. During the consensus meeting there was much discussion about whether or not to pass the JV based upon REC International's experience or not. Also, team members were aware of the ongoing project in [redacted] being constructed by the [redacted] JV, but no information was provided by the contractor in the prequalification package. Even though the [redacted] project is in excess of [redacted], it was not evaluated. After much discussion, the panel finally decided to not qualify the JV.
> Factor 3 Business Management Plan and Organization                 PASS
> Subcontractor/team member with [redacted].
> Overall Rating                                                     FAIL
> Desbuild does not have relevant experience.

(emphasis in original).

54

Defendant's explanation to intervenor of why Desbuild-REC failed Phase I, made in the brief April 6, 2012 brief letter to Desbuild-REC, was signed by Charles C. Krips as a "Senior Contract Administrator." The Factor 1 Joint Venture Agreement and Description of Partnership explanation includes an incomplete sentence and thought, and is exemplary of the cavalier approach defendant took toward this procurement, similarly demonstrated by check marked endorsements of who should be awarded the contract and a complete lack of documentation for many significant decisions, including reversals of prior decisions. But the recommendation language on Factor 1 is less important for this discussion because Desbuild-REC received a "PASS" on Factor 1.

The Factor 2 Technical Project Experience and Past Performance explanation indicated that:

> **Factor 2 Technical Project Experience and Past Performance** Fail
> While REC International produced evidence of performing a project similar in scope, complexity, and dollar value of the Moscow NOX project, Desbuild Inc. did not. Evaluation factor 2A.4 (JV Project examples) requires that each partner must show examples of project(s) that are similar in scope, complexity and dollar value of the Moscow project. The Desbuild projects in [redacted] do not qualify as relevant projects.

(emphasis in original). It is for the Factor 2 explanation that "each partner must show examples of project(s) that are similar in scope, complexity and dollar value" to the Moscow project that defendant, belatedly, during this bid protest, long after the defendant's reversal of its original decision to fail Desbuild-REC on their Phase I submission, now suggests might have been a mistake on its part, as articulated by defendant's counsel at oral argument before this court. There is no such concession in the record before the April 13, 2012 letter reversing defendant's decision, or until well after the bid protest was filed, and the concept of a mistake was first articulated by defendant's counsel at oral argument.

The April 13, 2012 reversal letter to Desbuild-REC stated, "our prequalification panel went through an extensive reevaluation of the package that you have submitted," but no documentation of any review, let alone an extensive review, is included in the administrative record. The letter simply indicated that "Desbuild-REC JV is qualified to continue on to the bidding process due to the cumulative experience of the JV Members." This same letter indicated that Desbuild-REC did not, however, qualify for the Percy Amendment price preference. As is discussed below, the Percy Amendment qualification decision also was reversed rapidly by the Department of State, in a similarly unexplained and unsupported fashion.

Until the plaintiff's protest was filed at the GAO, defendant did not try to provide any rationale for its decision reversals. Defendant now offers this court the statement of Mr. Krips during the GAO protest proceedings, in which he indicated that defendant also had considered the information included in the April 9, 2012 letter from Desbuild-REC to the Department of State as part of the reevaluation, and stated:

55

The prequalification process is not the competitive RFP phase. The whole intent of this phase is to identify qualified potential offerors to promote competition. The prequalification process involves give and take and sometimes communications with potential offerors to seek clarifications or additional information. It is common and is not prohibited by the terms of our solicitations for the Department to consider information outside the prequalification submission in determining offeror eligibility under the Omnibus Diplomatic Security Act (22 U.S.C. [sic] 4852) and offeror eligibility for the Percy Amendment price preference.

Whether or not the record in related GAO protest proceedings should be considered part of the administrative record in this court remains unresolved in this court's jurisprudence. The United States Court of Appeals for the Federal Circuit has emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1379-80 (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). The Federal Circuit explained, however, that supplementation of the record is not completely ruled out, but, that, "the parties' ability to supplement the administrative record is limited." Id. at 1379. The record only should be supplemented to include documents that were not before the agency at the time the decision was made in "cases in which 'the omission of extra-record evidence precludes effective judicial review.'" Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000)). Since the ruling in Axiom Resource Management, Inc. v. United States was issued, several judges on this court have found that documents that are part of the GAO record in the GAO protest filed before the same protest was brought to the Court of Federal Claims are admissible as part of the administrative record. See, e.g., Holloway & Co., PLLC v. United States, 87 Fed. Cl. 381, 392 (2009) (holding that RCFC Appendix C, ¶ 22, which specifies that "core documents relevant to a protest case may include, as appropriate," twenty-one categories of materials, the last of which is "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement," makes clear that documents generated during the GAO protest directly preceding the same protest in this court can properly be added to the record for this court's consideration); see also Vanguard Recovery Assistance v. United States, 99 Fed. Cl. at 102 ("[W]hatever materials were before GAO shall also be incorporated into the administrative record before the court."). Other judges on this court have disagreed, finding that "[j]udicial review is limited to the record actually before the agency." RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 261, 276 (2009); see also Orion Tech., Inc. v. United States, 101 Fed. Cl. 492, 496 (2011) ("While the declaration offered by plaintiff was part of the record before the GAO, it is not required to be made a part of the administrative record that this court reviews."). Still other judges have found that "[t]he thrust of the Axiom decision … is that this court must exercise restraint when considering whether or not to supplement the administrative record in a bid protest." L-3 Commc'n EOTech, Inc. v. United States, 87 Fed. Cl. 656, 671-72 (2009); see also Totolo/King v. United States, 87 Fed. Cl. 680, 693 (2009) ("This court therefore does not interpret the new guidelines in Axiom to change the trial court's

practice, other than to emphasize restraint and adherence to precedent."), appeal dismissed and remanded sub nom. Totolo/King Joint Venture v. United States, 431 F. App'x 895 (Fed. Cir. 2011).

This court agrees that the GAO proceedings in a related bid protest case can be made part of the record before this court. Defendant submitted an Agency Report to the GAO, as well as Mr. Krips' statement, and offered that same inadequate explanation to this court. Despite Mr. Krips' attempt to explain, however, he has not provided, and the record does not include, any explanation of what, if any, additional information defendant considered when making the reversal decision. In the seven-day interim between when Desbuild-REC was notified of its failure to pre-qualify and the decision reversal, Desbuild-REC, in an April 9, 2012 letter, requested a debriefing and asked a series of questions it wanted answered, but no new project information was submitted. Desbuild-REC's April 9, 2012 letter attempted to characterize Desbuild's role in the Moscow project as "limited," but it did not go so far as to say that Desbuild was not, as intervenor's Phase I submission represented, going to serve as the [redacted] percent majority partner for the Joint Venture. In this case, Mr. Krips' attempted explanation does not truly assist the defendant or the court, because it does not explain what information was used to arrive at the second, opposite decision. Moreover, Mr. Krips' statement that defendant could consider information outside of offerors' pre-qualification submissions conflicts with defendant's and intervenor's insistence in their briefs that defendant did not consider any additional information in making its reversal decision, but rather just re-considered Desbuild-REC's Phase I submission. Ultimately, the administrative record is devoid of any explanation of what information defendant considered in its allegedly "extensive reevaluation" or why defendant changed its mind and made what appears to be an arbitrary decision to pre-qualify Desbuild-REC to move on to Phase II of the procurement.

### Percy Amendment Qualification

Plaintiff's second argument is that defendant's reversal of its initial decision to deny Desbuild-REC a ten percent, Percy Amendment price preference was arbitrary, capricious, and contrary to law, and that defendant's initial decision to deny Desbuild-REC a Percy Amendment price preference was the correct decision as supported by the administrative record. No challenge to plaintiff's Percy Amendment qualification has been raised.

In order to qualify for the ten percent, Percy Amendment price preference, applicants had to submit a certified "Percy Amendment Certification Form," demonstrating that the offeror had performed "similar construction work in the United States or at a United States diplomatic or consular establishment abroad." In addition, the Pre-qualification Notice stated that, for joint ventures, "the company having 51 percent or greater interest in the JV must be the one completing the form." Desbuild submitted a certified form on February 28, 2012. In the April 13, 2012 letter signed by Robert Powell, which informed Desbuild-REC that defendant had reversed its earlier position to not allow Desbuild-REC to proceed to Phase II based on past, relevant

project experiences, defendant also notified Desbuild-REC that it did not qualify for the ten percent, Percy Amendment price preference. The defendant wrote:

> However, we have also determined that Desbuild-REC does **not** qualify for the price advantage denoted in the Percy Amendment. The amendment specifically requires that the American-owned firm must have performances of similar construction work in the United States or at a United States diplomatic or consular establishment abroad. While the [redacted] project is of similar size, scope and dollar value, the fact that Desbuild was only a [redacted] partner on the project causes this to not be relevant. Therefore, any bid submitted by your firm will be evaluated at the price given only.

(emphasis in original).

In response, Desbuild-REC sent defendant the April 19, 2012 letter requesting a reconsideration of the decision, in which Desbuild-REC tried to explain Desbuild's role on the [redacted] project it had listed on its Percy Amendment Certification Form. Shortly after receiving the April 19, 2012 letter from Desbuild-REC, defendant changed its previous Percy Amendment decision and contradicted its prior interpretation of the Percy Amendment submission requirements, as it had done with respect to its past project performance evaluation, once again without providing any rationale for the reversal. On April 23, 2012, in a letter to intervenor, Mr. Powell stated: "In discussions with OBO's legal advisor and under further review by the pre-qualification panel, we have determined that your Desbuild-REC **is** qualified to receive the price advantage denoted in the Percy Amendment." (emphasis in original).

According to plaintiff, Desbuild-REC's April 19, 2012 letter to defendant was, however, an improper source of additional information for defendant to consider regarding Desbuild-REC's qualification for the Percy Amendment price preference because it contained uncertified information which was not included on the properly submitted, certified, Percy Amendment Certification Form and, in fact, contradicted the certified statements made by Desbuild on its earlier certified, Percy Amendment Certification Form. In addition, plaintiff argues that the April 19, 2012 letter came, not from Desbuild directly, but from the Joint Venture. Plaintiff stresses that the Percy Amendment Certification Form stated that, if offerors had been a partner or co-venturer on a previous project, the offeror must list "the percentage of the project performed by the bidder/offeror." Desbuild stated on its Percy Amendment Certification Form that "Desbuild Inc. was [redacted] JV partner on the project in [redacted]." Desbuild-REC's April 19, 2012 letter explained that "the [redacted] referred to Desbuild's overall profit share, not Desbuild's day-to-day role." Plaintiff asserts that the April 19, 2012 letter, therefore, contradicted Desbuild's certified statement on the certified, Percy Amendment Certification Form that Desbuild had performed [redacted] of the work on the [redacted] project. Moreover, plaintiff contends that the Pre-qualification Notice required that Percy Amendment submissions be made by the majority partner in a joint venture, and,

therefore, the April 19, 2012 letter, which was sent by Desbuild-REC, not Desbuild, was an improper source of information and defendant should not have considered it.

Plaintiff maintains that there are not sufficient grounds upon which defendant could have reversed itself and granted Desbuild-REC a Percy Amendment price preference. The difference between the pre-qualification issue and the Percy Amendment issue, as articulated by plaintiff at oral argument, was that, by law, Desbuild alone was required to submit certified information regarding its Percy Amendment eligibility and the Department of State should not have, and, certainly not without explanation, accepted the uncertified, Joint Venture's revised information on one partner's, Desbuild's, [redacted] project participation. Thus, plaintiff argues, defendant's decision to grant Desbuild-REC a Percy Amendment price preference lacked a rational basis, and defendant's consideration of uncertified information submitted by Desbuild-REC was contrary to law.

Defendant and intervenor respond that defendant's decision to grant Desbuild-REC a Percy Amendment price preference was rational and within defendant's discretion. Defendant contends that the Percy Amendment determination was "[d]elegated to the contracting officer for this procurement." Defendant and intervenor both assert that the Percy Amendment does not define the term "similar construction work," but, rather, states that "determinations under this section shall be committed to the discretion of the Secretary of State." Intervenor argues that the GAO routinely has found that the Department of State is entitled to "substantial discretion" in making Percy Amendment determinations and that, while GAO decisions are not binding on this court, GAO precedent is particularly persuasive in this area because this court has rarely addressed the Percy Amendment. Indeed, the GAO has noted in decisions regarding the Percy Amendment that what constitutes "similar construction work" is a discretionary agency decision. See, e.g., Pernix-Serka, L.P., B-407656, B-407656.2, 2013 WL 936194, at *5 (Comp. Gen. Jan. 18, 2013); see also Perini Mgmt. Servs., Inc., B-404261, 2010 WL 5567994, at *4 (Comp. Gen. Dec. 17, 2010); Am. Int'l Contractors, Inc., B-260727, 1995 WL 324633, at *5 (Comp. Gen. May 31, 1995) ("[W]e accord substantial deference to the Department of State's interpretation of a statute that it is responsible for implementing."). As discussed above, however, GAO decisions are not binding on this court and the absence of precedent is not a reason for any court to shy away from its obligation to consider and decide the matters before it.

According to defendant's April 13, 2012 letter to Desbuild-REC, signed by the Contracting Officer, Robert Powell, the defendant acknowledged that the [redacted] project was "of similar size, scope and dollar value" as the Moscow project; but the issue was whether Desbuild's [redacted] role in the [redacted] project was sufficient for defendant to credit Desbuild with that project. Defendant maintains that neither the Percy Amendment nor any relevant regulations set a "requirement relating to either ownership percentage for similar construction work if one was organized as a joint venture or percentage of work performed." Rather, defendant asserts, Percy Amendment qualification is a discretionary determination for defendant alone to make on a case-by-case basis. Defendant states: "the only party that could make the

determination of whether Desbuild's performance tips into a yes or into a no is the agency here. This is something that is solidly within their discretion." Defendant indicates that the Percy Amendment Certification Form asks firms to report the percentage of the work they performed on previous projects simply as a way for defendant to gather information about an offerors' experience, but that there is no threshold percentage of performance or ownership a firm must demonstrate. Defendant stated at oral argument that Desbuild's [redacted] participation in the [redacted] project qualified as "similar construction work" for purposes of Percy Amendment qualification, however, defendant's counsel also agreed that Desbuild's Percy Amendment eligibility was "a close call" and that a decision the other way also "would be defensible."

Defendant asserts that Desbuild-REC's April 19, 2012 letter did not contradict Desbuild's Percy Amendment Certification Form because there is no requirement that a firm's ownership percentage correlate with the percentage of work it performed on a project. Thus, according to defendant, it was not inconsistent for Desbuild to state on the Percy Amendment Certification Form that it was a [redacted] joint venture partner on the [redacted] project, and for Desbuild-REC to then clarify in the April 19, 2012 letter that Desbuild actually played a larger day-to-day role in the project, without addressing that offerors were to submit the "percentage of the project performed by the bidder/offeror."

With regard to the lack of documentation, defendant again maintains that, while there is no one document in the administrative record that explains defendant's reversal of its initial Percy Amendment determination, several pieces of the record taken together sufficiently explain defendant's rationale, namely, 1) Desbuild's Percy Amendment Certification Form, which stated that Desbuild was a [redacted] joint venture partner in the [redacted] project, 2) the initial comments from defendant's Legal Advisor, Dennis Gallagher, indicating that Desbuild's qualification for a Percy Amendment price preference was a "close call," 3) Desbuild-REC's April 19, 2012 letter to defendant, explaining why Desbuild-REC should qualify for a price preference, and 4) defendant's April 23, 2012 letter to Desbuild-REC, indicating that, upon further review, defendant had determined that Desbuild-REC was eligible for a Percy Amendment price preference. In addition, defendant urges the court to consider the statement of defendant's Contract Specialist, Mr. Krips, filed at the GAO, in which he explained that it is common for an agency to reconsider a Percy Amendment decision and take additional information into account when doing so. The relevant portion of Mr. Krips' statement reads:

It is also common for the Department [of State] to reconsider decisions to deny eligibility under 22 U.S.C. [sic] 4852 [Omnibus Diplomatic Security and Antiterrorism Act of 1986] or price preference under the Percy Amendment when an adversely affected potential offeror requests reconsideration and supplies additional information.

In the present case, the Department first reconsidered the experience of the Desbuild-REC International joint venture based on the overall

60

experience of both joint venture partners, then reconsidered the Percy Amendment price preference eligibility of the joint venture based on Desbuild's performance on the [redacted] project. The [redacted] project is itself clearly a similar project and we determined that Desbuild's work on that project was substantial. As indicated in the Caddell Beijing example, there is absolutely no requirement that work as a minority joint venture partner be excluded from consideration.

Taken together, defendant argues, these documents show that defendant permissibly reevaluated Desbuild's participation in the [redacted] project and determined that Desbuild's role was sufficient to establish that Desbuild had conducted "similar construction work," and to qualify Desbuild-REC for a Percy Amendment price preference.

The Pre-qualification Notice stated that the Percy Amendment Certification Form had to be submitted with the pre-qualification package, and: "If a joint venture is formed, the company having 51 percent or greater interest in the JV must be the one completing the form." Plaintiff does not dispute that Desbuild completed the certified, Percy Amendment Certification Form that was submitted with Desbuild-REC's pre-qualification package, nor that Desbuild is an American-owned company. Plaintiff contests, however, whether Desbuild submitted sufficient evidence of "[p]erformance of similar construction work in the United States or at a United States diplomatic or consular establishment abroad." See 22 U.S.C. § 302. Desbuild's Percy Amendment Certification Form listed three projects as evidence of similar construction work: 1) the design/build of a [redacted], valued at [redacted], 2) the design/build of a [redacted], valued at [redacted], and 3) an interior/exterior renovation of [redacted], valued at [redacted]. The Percy Amendment Certification Form instructed the offeror: "If the bidder/offeror's participation was as a partner or co-venture, indicate the percentage of the project performed by the bidder/offeror." Desbuild wrote: "Desbuild Inc. was [redacted] JV Partner on the project in [redacted]. On all other projects, Desbuild Inc. was [redacted] owner."

Defendant's Legal Advisor, Mr. Gallagher, was asked by defendant's Contract Specialist, Mr. Krips, to evaluate the pre-qualification packages of ten United States firms to determine if they qualified for a Percy Amendment price preference. Mr. Gallagher concluded that Desbuild's eligibility for a Percy Amendment price preference was a "close call," placing a question mark on the line labeled "Yes" for "Qualifies under Percy," and commenting: "Desbuild ([redacted]) is U.S. firm and was minority ([redacted]) partner in [redacted] project, which is similar in size and type of construction. Other projects not similar. Close call if minority JV partner should be credited with completion of project, but guess so." Mr. Gallagher, therefore, found that the [redacted] project was "similar construction work" relative to the Moscow project, while Desbuild's two other listed projects in [redacted], were not. Mr. Gallagher also found that it was questionable whether Desbuild should be credited with the [redacted] project, but suggested qualifying Desbuild based on the [redacted] project. Nonetheless, Mr. Gallagher, apparently reluctantly, recommended to Mr. Krips that

61

Desbuild-REC receive a Percy Amendment price preference. Despite Mr. Gallagher's recommendation, Desbuild-REC's Percy Amendment eligibility was denied by the Contracting Officer, Robert Powell, and communicated to intervenor in Mr. Powell's April 13, 2012 letter to Desbuild-REC. There is no indication in the record of why Mr. Gallagher's recommendation was rejected. It seems that the Contracting Officer, Mr. Powell, to whom the authority to make the final Percy Amendment determination apparently was delegated, determined that Desbuild should not be credited with the [redacted] project.

Desbuild-REC responded to defendant on April 19, 2012, arguing that defendant's Percy Amendment determination was erroneous and requesting reconsideration. With respect to the [redacted] project, Desbuild-REC's letter stated:

> It is correct that Desbuild was a [redacted] partner on that project. However, the [redacted] referred to Desbuild's overall profit share, not Desbuild's day-to-day role. On that project, Desbuild had a substantial staff and had significant responsibilities for numerous highly relevant areas including design coordination; project management; onsite supervision; material procurement and shipping and selection of local vendors and subcontractors.

Desbuild-REC's April 19, 2012 letter tried to explain that Desbuild's statement on the Percy Amendment Certification Form that Desbuild was "minority ([redacted]) partner on [redacted] project" was actually intended to mean that Desbuild owned a [redacted] stake in the joint venture that completed the project. Desbuild-REC suggested in the April 19, 2012 letter that Desbuild performed more than [redacted] of the work on the [redacted] contract, and that the type of work that Desbuild performed was "highly relevant" to the Moscow project. In the April 19, 2012 letter, Desbuild-REC also cited to ¶ 2A.5 of the Pre-qualification Notice, which stated: "[p]roject examples in which the Offeror only acted as a General Contractor or did not self-perform at least 30% of the work will not be considered relevant." Desbuild-REC argued that this provision of the Pre-qualification Notice created a thirty percent "relevancy test" for previous projects and that "Desbuild meets that requirement for the [redacted] project." Desbuild-REC also argued that crediting Desbuild with the [redacted] project would be consistent with GAO precedent and with prior actions by the Department of State. Desbuild-REC concluded: "Here, the solicitation indicated that past performance would be considered if the contractor had 30% or more involvement. See Factor 2, ¶ 2A.5. Certainly, the solicitation did not prohibit consideration and reliance on Desbuild's significant [redacted] performance."

After receiving Desbuild-REC's April 19, 2012 letter, Mr. Powell responded to Desbuild-REC on April 23, 2012. With regard to Desbuild-REC's Percy Amendment qualification, Mr. Powell's April 23, 2012 letter, other than to offer a telephone number and email address for further questions, stated in its entirety: "In discussions with OBO's legal advisor and under further review by the pre-qualification panel, we have

determined that your Desbuild-REC **is** qualified to receive the price advantage denoted in the Percy Amendment." (emphasis in original).

Plaintiff is correct that defendant's April 19, 2012 letter to defendant relied on information which was not contained in Desbuild's certified, Percy Amendment Certification Form. Although Desbuild's Percy Amendment Certification Form simply listed the location, complexity, type of construction, value, and Desbuild's percentage role for each of the three listed projects, Desbuild-REC's April 19, 2012 letter contained a further explanation of Desbuild's role in the [redacted] project, as well as several arguments as to why defendant should credit Desbuild with the [redacted] project and reconsider Desbuild-REC's Percy Amendment eligibility.

Defendant and intervenor argue that Desbuild-REC's April 19, 2012 letter to defendant was not an improper source of additional information and defendant could consider the April 19, 2012 letter for its review of Percy Amendment eligibility. As noted above, intervenor cites to a GAO case, Pernix-Serka LP, 2013 WL 936194, for the proposition that defendant was allowed to consider information outside of Desbuild-REC's Phase I submission while making the Percy Amendment determination. Moreover, defendant and intervenor argue that plaintiff has not identified any law, regulation, case law, or provision in the Pre-qualification Notice that establishes that Desbuild-REC was not permitted to communicate with defendant during the pre-qualification process, nor that defendant could not consider information other than what was included in Desbuild's certified, Percy Amendment Certification Form when making the Percy Amendment determination. Defendant is correct that plaintiff does not point specifically to any case law to bolster its argument, and there do not appear to be any regulations or cases from this court directly on point.

As noted above, although this court is not bound by the decisions of the GAO, it does typically show respect to GAO decisions. In Pernix-Serka LP, cited by intervenor, a case also involving Desbuild, the protestor challenged the award of a Department of State contract to a Desbuild-Limak-Group 77 joint venture (DLG) to build an embassy compound in Baghdad, Iraq. Pernix-Serka LP, 2013 WL 936194, at *1. The protestor challenged, among other issues, the agency's decision to grant DLG a Percy Amendment price preference. Desbuild was the [redacted] percent majority partner in the joint venture and, as such, filled out the Percy Amendment Certification Form. Desbuild listed projects in Quantico, Virginia, New Delhi, India, and Kingston, Jamaica,[36] as evidence of similar construction work. Elsewhere in DLG's Phase I

---

[36] In Pernix-Serka, LP, DLG's Percy Amendment Certification Form stated that the value of the New Delhi, India project was $9.7 million, whereas in the instant case, Desbuild-REC submitted the [redacted] project to satisfy Subfactor 2A, Technical Project Experience, and stated in its Phase I submission that the value of the [redacted] project was [redacted]. Similarly, in Pernix-Serka, LP, DLG's Percy Amendment Certification form stated that the value of the Kingston, Jamaica project was $12.7 million, while Desbuild-REC's Percy Amendment Certification Form lists the value of the [redacted] project as [redacted]. Furthermore, in Pernix-Serka, LP, DLG's certified, Percy Amendment Certification form stated that the value of the [redacted] project was

proposal, however, DLG discussed Desbuild's work on the Mumbai, India project. Id. at *3. In response to the protest, the Department of State explained that it had considered Desbuild's role in the Mumbai project when making its Percy Amendment determination, even though the Mumbai project was not referenced on DLG's Percy Amendment Certification Form, but was indicated elsewhere in the proposal. The GAO stated: "In assessing protests under the Percy Amendment, our decisions reflect a limited and deferential review; we will not overturn an agency's subjective evaluation judgments unless they are unreasonable or inconsistent with the applicable procurement laws, regulations, or the solicitation." Id. at *5. The GAO then held: "Nothing in the Percy Amendment or solicitation prohibited the agency from considering information outside the form submitted by offerors." Id. Therefore, the GAO found that it was within the Department of State's discretion to consider the discussion of Desbuild's participation in the Mumbai project, although it was not mentioned on Desbuild's Percy Amendment Certification Form, in determining that DLG qualified for a Percy Amendment price preference. Id.

Pernix-Serka, LP, however, is factually distinguishable from the above captioned protest because, in Pernix-Serka LP, the GAO found that the agency could consider information about the Mumbai project contained in the offeror's Phase I submission, but not mentioned on the Percy Amendment Certification Form. In the case currently before the court, although Desbuild listed the [redacted] project on the Percy Amendment Certification Form, Desbuild-REC provided supplemental information about Desbuild's role on the [redacted] project in the April 19, 2012 letter. See Pernix-Serka, LP, 2013 WL 936194, at *5. The question, therefore, is whether the GAO's holding in Pernix-Serka, LP supports defendant's decision to consider Desbuild-REC's uncertified April 29, 2012 letter in addition to the Percy Amendment Certification Form.

Mr. Krips indicated in his sworn statement to the GAO that, in fact, it is not unusual for defendant to reconsider Percy Amendment determinations or to consider information outside of the Percy Amendment Certification Form, stating: "It is also common for the Department [of State] to reconsider decisions to deny eligibility under 22 U.S.C. 4852 or price preference under the Percy Amendment when an adversely affected potential offeror requests reconsideration and supplies additional information."

In the case currently before the court, defendant's Legal Advisor, Mr. Gallagher, initially evaluated Desbuild's Percy Amendment Certification Form and found that Desbuild-REC's eligibility for a Percy Amendment price preference was a "close call," but noted that he "guess[ed]" Desbuild-REC should be granted a ten percent price preference. Defendant's Contracting Officer, Mr. Powell, however, disagreed and initially communicated to Desbuild-REC that its Percy Amendment price preference had been denied in the April 13, 2012 letter.

---

[redacted], whereas Desbuild-REC's Percy Amendment Certification form stated that the value of the [redacted] project was [redacted]. Neither defendant nor intervenor addressed these inconsistencies.

64

Regardless of whether defendant properly considered the additional information contained in intervenor's April 19, 2012 letter, the court has no way of knowing whether defendant's reversal was based on the extent of intervenor's participation in the [redacted] project, and whether that participation was considered sufficient to qualify as "similar construction work." As with the reversal of the Phase I, Factor 2 pre-qualification decision, arbitrary and capricious behavior on the part of the Department of State is suggested by the failure of the Department of State to explain or document its quick reversal of Desbuild-REC's Percy Amendment price preference eligibility. Defendant is incorrect that the administrative record, as a whole, supports defendant's reversal decision. The record lacks any explanation of what information defendant considered when re-assessing Desbuild-REC's Percy Amendment eligibility and of why defendant changed its mind and determined Desbuild-REC had submitted sufficient examples of "similar construction work." Even a discretionary decision by an Executive Branch agency may need to be documented. See Mori Assocs., Inc. v. United States, 102 Fed. Cl. 503, 522 (2011) ("[E]ven when an agency adopted regulations purporting to give itself unlimited discretion to cancel solicitations, these decisions were still subject to challenge for arbitrariness."). In the case of a sudden and unexplained decision reversal, an explanation must be offered by the agency to demonstrate that it was not an arbitrary, capricious, or unfair decision to the detriment of other offerors during the procurement process. In this case, defendant indicated in its April 23, 2012 letter to Desbuild-REC that following discussions with the legal advisor, further review by the pre-qualification panel had occurred, but no justification or documentation for the reversal was offered.

Moreover, it appears that defendant was not transparent or above-board with Caddell, even after contract award. In Mr. Krips' memorandum summarizing the debriefing call with Caddell after award to Desbuild-REC stated, in response to questions about Desbuild-REC's Percy Amendment qualification, "I told him [Caddell's CEO, Eddie Stewart] that the Department of State Office of the Legal Advisor made all Percy qualifications, and that the technical panel had no input on this." As demonstrated above, however, Mr. Dennis Gallagher, the Legal Advisor, did not make all the Percy Amendment qualifications decisions. In fact, in his April 3, 2012 Review of Percy Qualifications memorandum sent to Mr. Krips, Mr. Gallagher stated that Desbuild-REC's eligibility for the Percy Amendment was a "close call." He placed a question mark on the line labeled "Yes" for "Qualifies under Percy," and wrote under "Comments:" "Desbuild ([redacted] JV) is U.S. firm and was minority ([redacted]) partner in [redacted] project, which is similar in size and type of construction. Other projects not similar. Close call if minority JV partner should be credited with completion of project, but guess so." Mr. Gallagher further indicated that the [redacted] project qualified as "similar construction work" for the Moscow project, but was unsure whether Desbuild should be credited with the [redacted] project for the Percy Amendment preference, because Desbuild was a [redacted] joint venture partner. Mr. Gallagher concluded, that he guessed Desbuild-REC should qualify for a Percy Amendment price preference. Despite his conclusions, the Department of State initially rejected Mr. Gallagher's recommendation and concluded that Desbuild-REC did not qualify for the Percy Amendment price preference.

65

The record before the court on the Percy Amendment eligibility decision made by the Department of State personnel suggests that arbitrary, capricious, unsupported, and reactive decision-making, without justification, may have occurred. More reasoned, transparent, documented decision-making should be the standard by which important procurement decisions are made.


*Award Decision*

Finally, plaintiff claims that defendant's decision to award the contract to Desbuild-REC was arbitrary, capricious, and contrary to law. Plaintiff argues that Desbuild-REC should have been disqualified from submitting a Phase II offer altogether, and that, even if Desbuild-REC had been properly pre-qualified, Desbuild-REC's offer should have been evaluated at the full price, instead of with the ten percent, Percy Amendment price preference applied. Plaintiff asserts that, had defendant properly evaluated Desbuild-REC's Phase I and Phase II proposals, Caddell's Phase II offer would have been the highest technically rated and lowest-priced offer, and, thus, Caddell would have been selected for contract award.

In addition, plaintiff maintains that, even if defendant's pre-qualification and Percy Amendment decisions were not arbitrary and capricious, defendant's decision to award the contract to Desbuild-REC was arbitrary and capricious "because DOS failed to consider reasonably available information about Desbuild Inc.'s intentions to perform." According to plaintiff, "Desbuild-REC's submissions to DOS make clear that Desbuild Inc. is the majority venturer in name alone." Plaintiff points to the Business Management Plan submitted as part of Desbuild-REC's Phase I submission and argues that, in that Plan, "Desbuild Inc. failed to submit any evidence to DOS of its intention to devote any equipment or manpower resources to the Contract." Plaintiff also argues that Desbuild-REC's April 9, 2012 letter, stating that "Desbuild's role would be limited to certain management functions as indicated by the statement that no US Citizen would be posted at the site," "cannot be reconciled with Desbuild Inc.'s stated role as the [redacted] majority venturer and leader of the joint venture." In addition, plaintiff cites to Desbuild-REC's Phase II Management Plan, which included a list of "Executive/Supervisory Employees" and a list of replacement employees. Plaintiff states that on the "Executive/Supervisory Employees" list of [redacted], only [redacted] were Desbuild employees, [redacted] would be working in Washington, D.C. According to plaintiff, the list of replacement employees included two-hundred and six names, none of which appear to be Desbuild employees. Thus, plaintiff contends, Desbuild-REC's submissions to defendant clearly demonstrated that, while Desbuild was named the [redacted] joint venture partner, REC would be responsible for the vast majority of contract performance. Plaintiff asserts that it is "arbitrary, capricious, and contrary to law that the government could accept a joint venture proposal that on its face describes a method of proceeding that is not borne out by the facts included in the proposal." Plaintiff also argues that, overall, defendant's treatment of Desbuild-REC's Phase I proposal and Phase II submission was contradictory, as "Desbuild-REC was instead

66

permitted to downplay Desbuild Inc.'s role for purposes of defining the necessary technical project experience under Factor 2A but permitted to exaggerate Desbuild Inc.'s role for purposes of securing a Percy Amendment price preference." Such inconsistent and unfair treatment of intervenor's offer, plaintiff argues, makes defendant's final award decision arbitrary, capricious, and contrary to law.

Defendant maintains that the Department of State acted in accordance with the Pre-qualification Notice, Solicitation, and all applicable laws and regulations, and that the award decision should be upheld. Defendant and intervenor argue that plaintiff has failed to identify any statute, regulation, or provision of the Pre-qualification Notice or Solicitation with which defendant failed to comply in making its award decision.

As for plaintiff's argument that Desbuild was the majority partner of the Desbuild-REC Joint Venture "in name only," Desbuild-REC's Joint Venture Agreement, submitted as part of the Joint Venture's Phase I proposal, stated: "The shares of each Member in the Joint Venture shall be as follows: Desbuild – [redacted], REC International – [redacted]." The Joint Venture Agreement established that Desbuild and REC would be [redacted] liable for fulfilling the joint venture's obligations under the contract. The Joint Venture Agreement also indicated that Desbuild, "as Leader of the Joint Venture, will be authorized for all matters concerning the relations with members of the JV Team." Desbuild-REC's Phase I proposal also included a Business Management Plan, which indicated that the Joint Venture would have an Executive Committee with [redacted] representatives from each partner firm that would be responsible for overseeing the project. The Business Management Plan also indicated that Desbuild-REC would have a Head Office in Desbuild's existing Washington, D.C. offices, while REC's existing regional headquarters in Moscow would serve as the Project Support Office, and a Project Site Office would be established at the job site. According to the Phase I Business Management Plan, the Head Office in Washington:

[redacted]

The Project Support Office:

[redacted]

The Project Site Office:

[redacted]

By indicating in the Business Management Plan that Desbuild would have representatives on the Executive Committee, [redacted] employees in key leadership positions, and that the Joint Venture's head office would be housed in Desbuild's Washington, D.C. offices, Desbuild-REC's Phase I submission tried to describe a structure in which Desbuild could play a significant role in the Moscow project, even if its presence at the job site would be small.

Desbuild-REC also submitted a Management Plan as part of its Phase II submission. The Phase II Management Plan included a list of "Executive/Supervisory Personnel," with [redacted] included, as well as a "Staff/Key Personnel (Project Management) Replacement List," with approximately [redacted] listed. Plaintiff asserts that, of the [redacted] on the "Executive/Supervisory Employees" list, only [redacted] appeared to be Desbuild employees, while the list of replacement employees apparently included [redacted] Desbuild employees. From the materials submitted to the court, however, it is difficult to determine the origin of the employees. Desbuild-REC's Phase II Management Plan also indicated that, while REC had [redacted] employees located in Russia, head office personnel would be located in Desbuild's Washington, D.C. office. The Phase II Management Plan explained that the Joint Venture would hire a minimal number of United States citizens to work on-site because of a specialty security clearance requirement. Instead, United States Citizen Personnel stationed in the Joint Venture's Washington, D.C., and Istanbul offices would temporarily visit the site to oversee the project, while "[a]ll site work will be coordinated and managed by TCN's (Turkish Citizen Individuals) who hold several previous experiences working with OBO."

Based on the information provided in Desbuild-REC's Phase I and Phase II submissions about the structure of the Desbuild-REC Joint Venture, it is not clear whether plaintiff's allegation that Desbuild is the majority partner in name only was accurate. Once again, defendant did little to explain its decision to positively review Desbuild-REC's submissions, even given the unclear information provided by the Joint Venture. Defendant appears simply to have accepted Desbuild-REC's submission without trying to reconcile conflicting or unclear information. Defendant also failed to explain how it reconciled Desbuild-REC's representation in its April 9, 2012 letter to defendant that "Desbuild's role would be limited to certain management functions as indicated by the statement that no US Citizen would be posted at the site," with Desbuild-REC's representations throughout the rest of its Phase I and Phase II submissions that Desbuild was the [redacted] majority partner in the Joint Venture. The lack of documentation does give rise to a concern that, as plaintiff alleges, Desbuild-REC was allowed to inconsistently downplay Desbuild's role for the purposes of the pre-qualification determination, but then emphasize Desbuild's majority partner status for purposes of securing the Percy Amendment price preference.

The Pre-qualification Notice and the Solicitation indicated that the contract would be awarded on a best-value basis and that defendant would conduct a trade-off process to determine which offer represented the best value to the government. The Phase II Solicitation listed two evaluation factors, Cost/Price and Management/Technical, and stated that "**the business management/technical proposal (Volume 2 of proposal) is ranked as significantly more important than the price proposal (Volume I of proposal)."** (emphasis in original). In addition, the Solicitation explained how defendant would evaluate offerors' Cost/Price proposals and each of the subfactors under the Management/Technical factor.

Seven offerors submitted Phase II proposals in response to defendant's Solicitation. Defendant's Technical Evaluation Board evaluated those seven initial proposals and found that:

> It is the consensus of the TEB that while Caddell's technical proposal is rated slightly higher than Desbuild-REC JV's technical proposal, the TEB feels that these two proposals are superior to the other technical proposals and stand in a category of their own. It is noted that these two firms are the only ones who are firmly established in Moscow and have ongoing construction projects similar in scope to the Moscow NOX.

Defendant's Office of Cost Management performed an initial cost analysis and found that, without the Percy Amendment price preference, a non-U.S. firm, Ant Yapi, represented the best-value offer; however, with the Percy Amendment price preference applied, Desbuild-REC's offer represented the best value to the government. As discussed above, the initial cost analysis considered plaintiff separately because Caddell had not included information about the VAT in its initial proposal, but fixed that omission in its Best and Final Offer. Based on those recommendations, defendant established a competitive range for the Moscow project consisting of plaintiff, Desbuild-REC, and FKE JV.

Plaintiff, Desbuild-REC, and FKE JV all submitted final proposals. The Technical Evaluation Board evaluated the final proposals and reported that it had come to a consensus opinion that Desbuild-REC's and Caddell's proposals were rated "excellent," while FKE JV's proposal earned a rating of "satisfactory." The Technical Evaluation Board recommended Desbuild-REC for contract award, explaining:

> The consensus report of the initial proposals indicated that Caddell's proposal was rated ever so slightly higher than Desbuild-REC Int'l JV's proposals. However, after holding discussions with the firms in the competitive range and evaluating the BAFO technical proposals, both firms are rated equally qualified from the technical standpoint. The TEB is confident that both Desbuild-REC Int'l JV and Caddell have the technical capability to successfully construct the NOX contract and any differences in their technical proposals are insignificant. After reviewing the BAFO prices, the TEB recommends that the Contracting Officer select Desbuild-REC Int'l JV for contract award because it offers the to the Government.

The Office of Cost Management issued a Summary of Cost Proposals, which showed that, excluding the VAT and the ten percent, Percy Amendment price preference, Desbuild-REC's was the lowest-priced offer at [redacted], while plaintiff's was the second-lowest-priced offer at [redacted]. The Director of the Office of Cost Management wrote to defendant's Contract Specialist, Mr. Krips, stating that the Office of Cost Management "believes that the proposal submitted by the lowest bidder, DESBUILD REC at [redacted] represents the best value offer and therefore recommends acceptance."

69

Defendant's Contract Specialist, Mr. Krips, sent a Recommendation for Contract Award to the Contracting Officer, Mr. Powell, recommending that defendant select Desbuild-REC for award of the contract because its submission represented the best value to the government. The Recommendation for Contract Award listed Desbuild-REC as one of the pre-qualified "U.S. Firms," without addressing the fact that defendant had reconsidered its initial decisions during the pre-qualification phase to deny Desbuild-REC pre-qualification, making intervenor ineligible to move on to Phase II of the procurement, and to deny Desbuild-REC Percy Amendment price preference eligibility, which probably would have made Desbuild-REC's price higher than Caddell's.

Regarding defendant's evaluation of Phase II submissions, the Recommendation for Contract Award stated:

> Going into the final round, Caddell's and Desbuild-REC JV's technical proposal were rated almost equal <u>with Caddell's technical proposal receiving a very slight higher rating</u>.[37] FKE JV was rated somewhat lower than Caddell and Desbuild-REC JV. After the review of the final proposals, the TEB found that Caddell and Desbuild were rated almost equal.

(emphasis added). The Recommendation for Contract Award confirmed that the contract was to be awarded on a best-value basis, with technical criteria being "significantly more important than price criteria." The Recommendation for Contract Award then stated that Caddell and Desbuild-REC were both ranked number one on the technical ranking, with FKE JV at number two, and that Desbuild-REC had the lowest price. The Recommendation for Contract Award indicated that defendant had used a trade-off process to determine which proposal represented the best value to the government, and found:

> In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price. Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.

Thus, based on the recommendations of both the Technical Evaluation Board and the Office of Cost Management, Mr. Krips recommended that defendant's contracting officer select Desbuild-REC for contract award. Defendant awarded the contract to Desbuild-REC on September 26, 2012.

---

[37] Reference to Caddell's slightly higher technical rating disappears from consideration as the procurement proceeds. In fact, in the same Recommendation for Contract Award, there is the reference to Caddell and Desbuild-REC as both ranked number one on the technical rating, as well as the statement that "the contractor that submitted the highest rated technical proposal also submitted the most reasonable price."

The Solicitation indicated that the contract would be awarded on a best-value basis, stating: "**The contract award will be made to the acceptable, responsible Offeror based on that Offeror's proposal which offers to the Government the best value in terms of technical and price factors as indicated in this Section M.**" (emphasis in original).  The Solicitation stated, with regard to a trade-off process:

> The Government may consider award to other than the lowest priced offeror or other than the highest technically rated offeror based upon the evaluation factors and subfactors stated in the solicitation. This source selection will be based upon Best Value and may result in an award being made to a higher rated, higher priced offeror where the decision is consistent with the evaluation factors and where it is deemed by the Government that the technical superiority, overall business approach, and/or the past performance of the higher priced offer outweighs the benefits of any price difference. The Government, using sound business judgment, will base the source selection decision on a trade-off analysis of the proposals submitted in response to this solicitation in accordance with the evaluation factors established for this solicitation.

Mr. Krips' Recommendation for Contract Award, however, indicated that defendant concluded that Desbuild-REC's offer was both the lowest-priced and also the highest technically rated offer.  The Recommendation for Contract Award also stated explicitly that "[t]he Government used the tradeoff process to determine the proposal that represents the best value to the Government," notwithstanding the rankings of the offerors.

The FAR at 48 C.F.R. § 15.101-1 describes the procedures that agencies should employ in conducting a trade-off process, as follows:

> (a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to <u>other than the lowest priced offeror or other than the highest technically rated offeror</u>.

> (b) When using a tradeoff process, the following apply:

>> (1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and

>> (2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.

> (c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced

71

proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

48 C.F.R. § 15.101-1 (emphasis added).

The predetermination in the Pre-qualification Notice to use a trade-off analysis, and the application of a trade-off analysis to evaluate and award the contract to Desbuild-REC when it was considered by defendant to be the lowest-priced and highest technically rated offeror, is peculiar at best. Mr. Krips' Recommendation for Contract Award stated that "[t]he Government used the tradeoff process to determine the proposal that represents the best value to the Government." Although a trade-off analysis was projected in the Pre-qualification Notice before it was indicated by the offers received, even Mr. Krips' Recommendation for Contract Award did not seem to direct that a trade-off analysis should be conducted and did not explain if or how the trade-off process was conducted. The use of a trade-off analysis when one was not indicated by the applicable regulations is another indication of defendant's careless procedures in conducting this procurement.

The FAR also prescribes the Source Selection Authority's responsibilities when performing a best-value determination, and the documentation needed to support an agency's source selection decision. The relevant provision provides:

The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (2012); see also Akal Sec., Inc. v. United States, 103 Fed. Cl. at 336 ("FAR 15.308 has two relevant requirements: 1) the SSA must use his or her independent judgment in making a source selection and 2) the source selection decision must be documented, including the rationale for any business judgments and tradeoffs made or relied on by the SSA."); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 381 (2011) ("[W]hen selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the government to simply state that a proposal's technical superiority is not worth the payment of a price premium. Instead, the government must explain specifically *why* it does not warrant a premium."). Thus, the FAR requires that the Source Selection Authority document his or her rational basis for making a best-value determination. See BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 682 n.4

72

(2012) ("The Source Selection Authority (SSA) did not prepare the SSD [Source Selection Decision], but signed the document under the rubric 'SSA Approval/Concurrence.' The SSA provided no statement within or attached to the SSD that explained his award decision…. There is some question whether a mere signature shows that an SSA exercised independent judgment in conformance with this regulation."); see also Serco Inc. v. United States, 81 Fed. Cl. at 497 ("[c]onclusory statements, devoid of any substantive content, have been held to fall short of" the FAR's documentation requirement in 48 C.F.R. § 15.308.); Info. Scis. Corp. v. United States, 73 Fed. Cl. at 120 ("'Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the *fundamental requirement* that their *independent judgments* be reasonable, consistent with the stated evaluation scheme and adequately documented.'" (emphasis in original) (quoting Matter of Dyncorp Int'l LLC, No. B–289863, 2002 CPD ¶ 83, 2002 WL 1003564 (Comp. Gen. May 13, 2002))), recons. in unrelated part, 75 Fed. Cl. 406 (2007). To be well-documented, the source selection decision "must contain more than conclusory and generalized statements." Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723, 735 (2011) (citing Serco Inc. v. United States, 81 Fed. Cl. at 497).

In FirstLine, the court noted that "FAR 15.308 permits the SSA to 'use reports and analyses prepared by others,' but it also requires the SSA to document 'the rationale for any business judgments and tradeoffs made or relied on by the SSA....' 48 C.F.R. § 15.308." FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 383. Similarly, in Serco, the court wrote:

> Of course, it is conceivable that the SSA, in his own mind, made such cost/benefit comparisons, but merely failed to capture them on paper. But, that too would violate the FAR and its documentation requirements. To comply with the FAR, documentation must "include the rationale for any business judgments and tradeoffs made, including the benefits associated with additional costs."

Serco Inc. v. United States, 81 Fed. Cl. at 498-99 (quoting Si-Nor, Inc., B-282064, B-282064.2, 1999 WL 33210196, at *3 (Comp. Gen. May 25, 1999)).[38]

---

[38] In Standard Communications, Inc. v. United States, an argument was raised that "the SSA's statements were satisfactory because FAR [15.308] only requires explanatory documentation when a higher-priced proposal is selected over lower-priced proposals." The court, however, indicated that:

> Defendant is partially correct in its reading of FAR 15.308—when selecting a proposal that involves "additional cost," the rationale for the decision must be documented. However, defendant reads the provision to require documentation only in that scenario. In its interpretation, defendant overlooks the qualifying term "including," a word that indicates that the material that follows is neither exclusive nor exhaustive. Therefore, the Court finds that defendant's interpretation is unpersuasive. FAR 15.308 does not excuse an SSA from documenting his or her reasoning for

In the above captioned protest, there were many unexplained actions and inconsistencies, which make it difficult for the court to determine the role, hierarchy, and authority of defendant's various officials and whether the official who made the final award decision exercised independent judgment. With regard to defendant's trade-off analysis, the only document in the administrative record that provides any rationale for defendant's award of the contract to Desbuild-REC was Mr. Krips' Recommendation for Contract Award. Mr. Krips' Recommendation for Contract Award briefly summarized the procurement process, including the evaluation of both the Phase I and Phase II proposals. Mr. Krips' Recommendation for Contract Award concluded that, once Best and Final offers were submitted, Caddell and Desbuild-REC both were ranked number one on technical ratings, with FKE JV ranked number two, and that Desbuild-REC had the lowest price once the offerors made their Best and Final Offers. Mr. Krips' Recommendation for Contract Award stated:

> **O. Recommendation for Award:**
> The Government used the tradeoff process to determine the proposal that represents the best value to the Government. Technical factors were significantly more important than cost in the tradeoff process. Offerors were advised in the RFP that the award may be made to the contractor submitting other than the lowest price, when, in the judgment of the Government the combination of merit and costs represents the best value to the Government [sic]
>
> In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price.[39] Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.
>
> In accordance with FAR 9.104-1, it has been determined that Desbuild-REC JV has both the technical and financial resources to perform this contract. Desbuild Incorporated-Renaissance International JV is not on the GSA list of suspended or debarred contractors and is therefore eligible for contract award.

---

> declining to pay a premium for a higher-priced, technically superior proposal, particularly in a situation where, as here, the non-price factors were said to be more important than price.

Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. at 736 (internal citations omitted).

[39] This statement conflicts with Mr. Krips' statement, just several lines above on the same page, that plaintiff and intervenor were both ranked number one on technical factors, as well as defendant's earlier statement that Caddell was rated slightly higher than Desbuild-REC on technical factors.

74

The top of the first page of Mr. Krips' Recommendation for Contract Award, reads "**ACTION MEMORANDUM FOR ROBERT R. POWELL- SOURCE SELECTION AUTHORITY.**" (emphasis in original). The Recommendation reads:

> That you approve the selection of Desbuild Incorporated – REC International JV to construct the Moscow Annex Office building. The award of a contract to Desbuild-REC JV is recommended because their final proposal submission represents the best value for the U.S. Government in accordance with the evaluation criteria in the Request for Proposal SAQMMA-12-R-0117. The contract amount is [redacted].

After the Recommendation, there are two lines, one marked "Approve" and one marked "Disapprove." A check mark was placed on the line marked "Approve." Next to the name "ROBERT R. POWELL," the initials "RRP" were initialed. Mr. Krips also initialed the document.

There do not appear to be any documents included in the record between the time Mr. Krips issued his Recommendation for Contract Award and the signed contract award document sent to Desbuild-REC on September 26, 2012. No document is in the record in which defendant's Contracting Officer, Mr. Powell, offered any explanation regarding why Desbuild-REC was selected for contract award. Although the evaluation placed plaintiff and intervenor in close proximity on the technical factors and the two were the closest on price, the only documented rationale for defendant's decision to award the contract to Desbuild-REC was authored by Mr. Krips, who was not the Source Selection Authority and not the Contracting Officer.

In addition, the contract itself presents further irregularities. On the signed copy of the contract included in the record, under section "31a. NAME OF CONTRACTING OFFICER," there is a signature line which has underneath it the name, "Robert Powell." A different name, David W. Vivian, however, was signed as the signatory for the United States of America. There are only two references to David W. Vivian in the administrative record, the signed contract and the signature on defendant's September 26, 2012 letter to Desbuild-REC, informing Desbuild-REC that it had been awarded the contract, both of which Mr. Vivian signed as "Contracting Officer." Neither defendant nor intervenor addressed Mr. Vivian's role in the procurement in either their briefs or at oral argument. Moreover, defendant's September 26, 2012 letters to FKE JV and Caddell, informing them that they had not been awarded the contract, were signed by "Robert Powell, Contracting Officer," and Amendment Number 1 to the Solicitation, like the signed contract, listed Robert Powell as the Contracting Officer. The record before the court does not explain who Mr. Vivian was, nor why he signed the contract when Mr. Powell was the listed Contracting Officer. If Robert Powell was the source selection official, as indicated by Mr. Powell's initialing Mr. Krips' Recommendation for Contract Award, why did Mr. Vivian sign the contract?

Mr. Powell's mere initialing of Mr. Krips' Recommendation for Contract Award and check off of the line marked "Approve" under the Recommendation, also raises issues as to whether there is in the record a sufficient showing that Mr. Powell had exercised sufficient independent judgment in satisfaction of FAR 15.308. Even if Mr. Powell, in his own mind, analyzed the record and made cost/benefits comparisons between the final offers of Caddell, Desbuild-REC, and FKE JV, his failure to document his deliberation on paper violates FAR 15.308. See Serco Inc. v. United States, 81 Fed. Cl. at 498-99. Mr. Powell's actions, to check off a line marked "Approve" and to initial a Recommendation for Contract Award prepared by defendant's Contract Specialist, Mr. Krips, demonstrate even less independent analysis than the Source Selection Authorities' actions in Information Sciences Corp. and FirstLine, both cases in which the courts found the Source Selection Authority's decision fell short of FAR 15.308's requirements.

In Information Sciences Corp., 73 Fed. Cl. 70, and FirstLine Transportation Security, Inc., 100 Fed. Cl. 381, the Source Selection Authority at least included a short statement indicating that a review of the analysis of the officials below the Source Selection Authority had been conducted and whether the source selection official agreed or disagreed with the analysis. In the instant case, Mr. Powell never offered any statement in his own words as to why he approved Mr. Krips' recommendation. Nor did Mr. Powell offer his thoughts regarding what, if any, business judgments were made that led to Desbuild-REC's selection. Even with the multiple decision reversals leading up to defendant's award decision, Mr. Powell appears to have simply signed off on a document that was authored by defendant's Contract Specialist, Mr. Krips. The plain language of FAR 15.308 requires that, "[w]hile the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment." In Information Sciences Corp., the court described the importance of documenting a selection decision, even if a selection official agrees with the recommendation forwarded to him or her in order to demonstrate the exercise of independent judgment. See Info. Scis. Corp. v. United States, 73 Fed. Cl. at 121 ("Although the FAR contemplates that decisional authority may be supported by other procurement officials, nevertheless, FAR 15.308 requires evidence of the exercise of independent judgment. Therefore, the SSA simply can agree with the reasoning of the CO [Contracting Officer] or Minority Report, but only if the SSA provides an independent rationale for that agreement." (emphasis in original)); see also Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. at 736 (finding that the Source Selection Authority's reference in her selection decision to the analysis of various source selection officials below her were inadequate because, "[a]lthough the SSA may have been fully briefed, she did not document her consideration of the facts and figures presented to her in a way that satisfies FAR.").

The court recognizes that Akal Security, Inc. v. United States, presented similar circumstances in which the Source Selection Authority merely adopted prepared reports by "signing his name next to the word 'Approved,'" but in upholding such a practice under FAR 15.308, the Akal court emphasized that there was "no evidence of disagreement" in the record and indicated that the court's decision was consistent with

the presumption of regularity. <u>Akal Sec., Inc. v. United States</u>, 103 Fed. Cl. at 335-36. It is not sufficient, however, for a source selection authority to simply initial, or check the "Approve" line of a recommendation, and meet the independent judgment requirement of FAR 15.308, particularly when, as here, procurement officials have not advanced consistent positions, and have reversed themselves multiple times without documentation of their reasons, during the selection process. As noted above, even if Mr. Powell did make an independent decision in his own mind, which seems counter to the apparent lack of documentation in the record and evidence of Mr. Powell's lack of involvement during the contract process before and after contract selection, FAR 15.308 requires documentation of the Source Selection Authority's independent award decision in the record. The record in this case lacks documentation of such an independent award decision. If Mr. Vivian was the Contracting Officer and Source Selection Authority, there is even less documentation in the record to demonstrate his approval or disapproval of the award to Desbuild-REC and no evidence in the record his independent judgment was exercised.

Moreover, the document on which the source selection official relied, Mr. Krips' Recommendation for Contract Award, was itself conclusory and contained errors and information that conflicted with other documents in the record. Mr. Krips' Recommendation for Contract Award described the Technical Evaluation Board's evaluation of the offerors' final proposals, stating:

> On September 13, 2012, the technical Evaluation Board reconvened to review the revisions to the technical proposals submitted by Caddell; Desbuild-REC Int'l JV; and FKE JV. Going into the final round, Caddell's and Desbuild-REC JV's technical proposal were rated almost equal with Caddell's technical proposal receiving a very slight higher rating. FKE JV was rated somewhat lower than Caddell and Desbuild-REC JV. After the review of the final proposals, the TEB found that Caddell and Desbuild were rated almost equal. There was improvement in the FKE JV proposal but it was not rated as high as either Caddell or Desbuild-REC JV.

Mr. Krips' Recommendation for Contract Award listed the initial proposed costs and the best and final offers for each of the three offerors, stating that Desbuild-REC's best and final offer was evaluated at [redacted], Caddell's at [redacted], and FKE JV's at [redacted], all including the VAT, and that all three offerors were deemed eligible for the Percy Amendment price preference. After reciting the technical and price evaluations performed by defendant's Technical Evaluation Board and Office of Cost Management, respectively, Mr. Krips' Recommendation for Contract Award included the following information:

> **N. Selection of Contractor:**
> <u>Consensus Technical Rankings</u>:
> The following is the consensus ranking of the three contractors' technical proposals (highest to lowest). See the attached Consensus Report.

1. Caddell and Desbuild-REC JV
2. FKE JV

Price Evaluation:
Based upon comparison with Caddell's price, Desbuild-REC Int'l JV's price is considered to be a fair and reasonable price.

**O. Recommendation for Award:**
The Government used the tradeoff process to determine the proposal that represents the best value to the Government. Technical factors were significantly more important than cost in the tradeoff process. Offerors were advised in the RFP that the award may be made to the contractor submitting other than the lowest price, when, in the judgment of the Government the combination of merit and costs represents the best value to the Government.

In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price. Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.

[sic] In accordance with FAR 9.104-1, it has been determined that Desbuild-REC JV has both the technical and financial resources to perform this contract. Desbuild Incorporated-Renaissance International JV is not on the GSA list of suspended or debarred contractors and is therefore eligible for contract award.

(emphasis added). The summary Recommendation statement on the first page of Mr. Krips' Recommendation for Contract Award states, "[t]he award of a contract to Desbuild-REC JV is recommended because their final proposal submission represents the best value for the U.S. Government in accordance with the evaluation criteria in the Request for Proposal SAQMMA-12-R-0117," and the summary information quoted above represents the entirety of defendant's scanty, trade-off analysis contained in the record.

As the Standard Communications court noted, to be well-documented, the source selection decision "must contain more than conclusory and generalized statements." Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. at 735 (citing Serco Inc. v. United States, 81 Fed. Cl. at 497 ("Conclusory statements, devoid of any substantive content, have been held to fall short of…" the requirements in FAR 15.308.)). The Serco court further stated that articulating business judgments requires more of the Source Selection Authority than "simply parrot[ing] back the strengths and weaknesses of the competing proposals." Serco Inc. v. United States, 81 Fed. Cl. at 497. Although in both Standard Communications and Serco the source selection authority selected a higher-priced offeror, whereas here defendant chose an offeror that

78

defendant claimed offered both the lowest price and the highest technical rating, the Standard Communications court made clear that FAR 15.308 still requires a Source Selection Authority to document his or her rationale for selecting the lowest-priced offeror, and that such documentation requires more than conclusory statements. See Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. at 736. Mr. Krips' Recommendation for Contract Award, which in the instant case also represents Mr. Powell's selection decision, falls far below that standard. There is no narrative summary of the technical strengths and weaknesses of the three offerors that were included in the competitive range, much less a discussion comparing those offerors to one another. Mr. Krips' Recommendation for Contract Award simply states that Caddell and Desbuild-REC were both ranked technically number one or, inexplicably, that Desbuild-REC offered the highest technically rated offer, with FKE JV ranked number two, and lists the offerors' prices. The only statement representing a business judgment or rationale was: "In this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price." That statement fails to address plaintiff, Caddell's, equally, if not slightly higher, ranked offer. The Recommendation for Contract Award contains no explanation of why Desbuild-REC's proposal was recommended, when Caddell's proposal was rated slightly higher than Desbuild-REC's technical proposal at one point during the evaluation and the proposals were close in price. FAR 15.308 requires more than a recitation of offerors' technical ratings and prices and Mr. Krips' Recommendation for Contract Award fails to supply an explanation of why Desbuild-REC's proposal represented a better value to the government than Caddell's or FKE JV's proposals. For this reason, even if Mr. Krips' Recommendation for Contract Award represented the considered decision of defendant's Source Selection Authority, it would fall short of FAR 15.308's requirements. The court is not substituting its judgment for that of the agency; rather, the agency has failed to do its job by failing to document its decisions and trade-offs. Because the record contains no documentation of an independent award decision by defendant's Source Selection Authority, the selection decision, which utilized the trade-off process, violates FAR 15.308.

In Impresa Construzioni Geom. Domenico Garufi v. United States, the United States Court of Appeals for the Federal Circuit explained that the APA standard of review permits contract awards to be set aside "if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332. When an award decision lacks a rational basis, "the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Id. In Impresa Construzioni Geom. Domenico Garufi v. United States, the Federal Circuit stated the following with respect to circumstances in which the court was unable to determine whether a contracting officer's decision was arbitrary and capricious based on the lack of documentation of that decision in the record:

> The government urges, and the Court of Federal Claims found, that Garufi
> [the protester] has not sustained the burden on this record of showing that

the finding of responsibility was necessarily invalid. But the problem is that we also do not know whether the contracting officer's determination was valid either since the contracting officer's reasoning supporting that determination is not apparent from the record, and Garufi has been denied the opportunity to determine the contracting officer's explanation for finding JVC [the contract awardee] responsible. . . . This conundrum leads us into a most difficult and confusing area of administrative law, namely the circumstances under which an administrative agency will be compelled to provide an explanation for its decision. . . . Contracting officers are not obligated by the APA to provide written explanations for their actions. Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing. See <u>John C. Grimberg Co. v. United States</u>, 185 F.3d [1297,] 1303 [(Fed. Cir. 1999)]. Nor are they formal rulemakings. As the government correctly points out, where the contracting officer makes a determination of responsibility, as opposed to the situation in which he [or she] makes a determination of non-responsibility, the regulations do not require the contracting officer to 'make, sign and place in the contract file a determination of' responsibility which states the basis for the determination. . . . However, under the APA even where an explanation or reason is not required, a reviewing court has power to require an explanation. . . . Because of [the] presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.

<u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1337–38. The Federal Circuit suggested that, in the procurement context, a court should elicit an explanation from a contracting officer through testimony, rather than by remanding the contracting officer's decision to the procuring agency. See <u>id.</u> at 1339; <u>see also</u> <u>Linc Gov't Servs., LLC v. United States</u>, 108 Fed. Cl. at 493.

In this bid protest case, however, the lack of documentation in the record of the Department of State's reversals with respect to the pre-qualification and Percy Amendment price preference decisions, as well as the numerous irregularities that occurred during the course of this procurement, suggest that defendant may have chosen not to explain the reversals in this court. The agency took advantage of an opportunity to explain itself through the Agency Report submitted at the GAO, as well as in Mr. Krips' declaration submitted at the GAO, which the court accepts as admissible here. Neither the Agency Report nor Mr. Krips' statement, however, provide the necessary explanations. Defendant's Agency Report only briefly mentioned that defendant reversed its initial determinations that Desbuild-REC neither pre-qualified for the contract, nor was eligible for the Percy Amendment price preference, but does not include any explanation of why defendant changed its mind on either issue. In his statement to the GAO, Mr. Krips simply stated that the agency reconsidered its decision not to pre-qualify Desbuild-REC, "based on the overall experience of both joint venture partners," and reconsidered its decision to deny Desbuild-REC the Percy Amendment

price preference, "based on Desbuild's performance on the [redacted] project," which Mr. Krips believed to be "clearly a similar project."  Mr. Krips also indicated that defendant reversed its decision on the Percy Amendment price preference based on a determination that "Desbuild's work on that project was substantial."  In neither document was the extensive analysis defendant claimed it undertook within the relatively short amount of time before defendant reversed its decision offered for the record at the GAO or to this court.  Mr. Krips' explanation does not provide the court with sufficient information to evaluate the reasonableness of the agency's decision to reverse the pre-qualification and Percy Amendment price preference decisions.[40]  The agency's quick and undocumented reversals of its decisions not to prequalify Desbuild-REC and not to qualify Desbuild-REC for the Percy Amendment price preference strongly suggest arbitrary and capricious action.  The court, however, does not seek further explanation of these decisions from defendant because the agency has had an opportunity to explain itself, tried to do so at the GAO, but still offered little of substance and failed to demonstrate it did not act in an arbitrary and capricious manner and in violation of applicable statutes and regulations during the course of the procurement.  In this court, there was much discussion of the supporting documents, including multiple requests to get more legible copies of Mr. Gallagher's, Percy Amendment analysis.  None of these discussions generated any requests by defendant to supplement the record in any way, other than to include the GAO record, including Mr. Krips' statement, as part of the record in this court for this court's consideration.  Even under Impresa, having had the opportunity to explain its actions, it does not seem necessary to give defendant yet another chance to fill in the gaps and to try to explain what may not be defensible.

### Prejudice

To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions.  See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1351 (noting that to establish prejudice for an alleged violation of statute or regulation, a protestor must show that there was a "substantial chance" it would have received the contract absent the alleged error) (citations omitted).

There has been some confusion in this court's jurisprudence between what one Judge on this court has dubbed "allegational prejudice" versus "APA prejudice."  See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 695.  "Allegational prejudice" refers to the threshold showing that a plaintiff must make in order to demonstrate that it is an interested party under 28 U.S.C. § 1491(b)(1), which is required to establish

---

[40] The court notes that it must evaluate the agency's rationale "at the time of decision."  See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. at 654.  In addition to being unhelpful, Mr. Krips' GAO testimony constitutes a post-hoc explanation and does not reveal the contracting officers' contemporaneous reasons for reversing the pre-qualification and Percy Amendment price preference decisions.

standing in a bid protest case. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 695. "Allegational prejudice" is to be judged before the court analyzes the lawfulness of the agency's allegedly improper action and "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true." See id. at 696 (citing USfalcon, Inc. v. United States, 92 Fed. Cl. at 450 (explaining that "for purposes of standing" the court "must accept the well-pled allegations of agency error to be true")). There is no question in the court's mind, as discussed above, that plaintiff passes the "allegational prejudice" test. "APA prejudice," on the other hand, refers to the second type of prejudice a plaintiff must establish in order to prevail in a bid protest case. That second prejudice requirement is rooted in the standard of review under the APA, which 28 U.S.C. § 1491(b) establishes as the standard of review for bid protest cases. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 696 (citing Textron, Inc. v. United States, 74 Fed. Cl. at 284-85). In order to establish "APA prejudice," a plaintiff "'must show that there was a "substantial chance" it would have received the contract award but for the errors' that the court determines the agency made." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 696 (quoting Bannum, Inc. v. United States, 404 F.3d at 1353).

The facts in the above captioned protest demonstrate that plaintiff was next in line for the Moscow contract if the contract had not been awarded to Desbuild-REC and that, but for the Department of State's procurement errors, Caddell had a substantial chance at receiving the contract. In Phase I of the procurement process, all four members of defendant's Technical Evaluation Board found that plaintiff "Passed" the pre-qualification requirements and should be allowed to move on to Phase II. Also, defendant's Legal Advisor, Dennis Gallagher, determined that plaintiff qualified for the Percy Amendment price preference. After seven offerors made initial Phase II offers, defendant's Technical Evaluation Board found that plaintiff's and Desbuild-REC's proposals were superior to the rest, stating:

> It is the consensus of the TEB that while Caddell's technical proposal is rated slightly higher than Desbuild-REC JV's technical proposal, the TEB feels that these two proposals are superior to the other technical proposals and stand in a category of their own. It is noted that these two firms are the only ones who are firmly established in Moscow and have ongoing construction projects similar in scope to the Moscow NOX.

Plaintiff was one of the three firms, along with Desbuild-REC and FKE JV, included in defendant's competitive range. Defendant stated that each of those three offerors "submitted acceptable technical proposals and competitive prices." After negotiations, the three firms in the competitive range submitted final offers, which were evaluated by defendant's Technical Evaluation Board. The Technical Evaluation board came to a consensus opinion that Desbuild-REC's and Caddell's proposals earned a rating of "excellent," while FKE JV's proposal was rated "satisfactory." The Technical Evaluation Board initially indicated that plaintiff and Desbuild-REC's proposals were close to equal, or even that plaintiff's technical rating was slightly higher. Ultimately, the

Technical Evaluation Board recommended Desbuild-REC for contract award based on its lower price and highest technical rating, stating:

> The consensus report of the initial proposals indicated that Caddell's proposal was rated ever so slightly higher than Desbuild-REC Int'l JV's proposals. However, after holding discussions with the firms in the competitive range and evaluating the BAFO technical proposals, both firms are rated equally qualified from the technical standpoint. The TEB is confident that both Desbuild-REC Int'l JV and Caddell have the technical capability to successfully construct the NOX contract and any differences in their technical proposals are insignificant. After reviewing the BAFO prices, the TEB recommends that the Contracting Officer select Desbuild-REC Int'l JV for contract award because it offers the best value to the Government.

Defendant's Office of Cost Management also recommended Desbuild-REC for contract award based only on its lower price, stating that the Office of Cost Management "believes that the proposal submitted by the lowest bidder, DESBUILD REC at [redacted] represents the best value offer and therefore recommends acceptance."

Caddell and Desbuild stood apart from the rest of the other Phase II offerors, and Desbuild-REC was selected because of its lower price. Desbuild-REC's final price was [redacted], Caddell's final price was [redacted], and FKE JV's final price was [redacted]. All three firms had been found eligible for the Percy Amendment price preference. Stating that the Consensus Technical Rakings put Caddell and Desbuild-REC both at number one, with FKE JV ranked number two, Mr. Krips' Recommendation for Contract Award concluded, although not entirely accurately, as follows:

> In this instance, the contractor that submitted the highest rated technical proposal[41] also submitted the most reasonable price. Therefore, it is recommended that a fixed price contract be awarded to Desbuild-REC JV in the amount of [redacted] (inclusive of VAT). Desbuild-REC Int'l JV's proposal represents the best value to the U.S. Government.

But for defendant's actions and violation of procurement regulations, plaintiff's offer, which was next in line and close, both technically and for price, to Desbuild-REC's offer, would have been the lowest-priced, highest-rated offer. Because technical criteria were to be given significantly more weight than price criteria, plaintiff's offer likely would have been selected over FKE JV's offer, the other offeror in the competitive range, which received a lower technical rating than both plaintiff and intervenor, and was higher-priced. Based on these facts, plaintiff has established that it had a substantial chance to receive the contract but for defendant's actions throughout the procurement

---

[41] As noted, at one point in the evaluation process, Caddell actually was ranked slightly higher than Desbuild-REC on the technical evaluation, and just several lines above on the same page, Mr. Krips' Recommendation for Contract Award stated that both Caddell and Desbuild-REC were the highest-rated offer.

process, as well as violation of procurement regulations. Therefore, plaintiff can establish prejudice.

### *Injunctive Relief*

Plaintiff seeks a permanent injunction of Desbuild-REC's performance of the contract for the Moscow project. In PGBA, LLC v. United States, the Federal Circuit set out the test for a permanent injunction, stating that a court must consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); PHT Supply Corp. v. United States, 71 Fed. Cl. at 12; Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 159 (2005); Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 279, opinion modified, 63 Fed. Cl. 141 (2004); Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. at 320–21 (citing Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000), aff'd, 10 F. App'x 957 (Fed. Cir. 2001)); ATA Def. Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 n.10 (1997) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." (quoting Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. at 546 n.12)), abrogation recognized in Balt. Gas & Elec. Co. v. United States, 290 F.3d 734 (4th Cir. 2002); CW Gov't Travel, Inc. v. United States, 12-708C, 2013 WL 1460458, at *23 (Fed. Cl. Mar. 27, 2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted)). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. at 369 (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). However, while success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that,

> "[n]o one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the

strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010).

In the above captioned protest, plaintiff has established success on the merits by demonstrating that the Department of State's award of the Moscow contract to Desbuild-REC was arbitrary, capricious, and not in compliance with applicable procurement regulations. Thus, the question is whether the other three equitable factors weigh in favor of granting plaintiff's requested permanent injunction.

"When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" CW Gov't Travel, Inc. v. United States, 2013 WL 1460458, at *24 (quoting Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000)). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 2013 WL 1460458, at *24 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. at 390–91; Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828.); see also BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 245 (2012) (citing several cases); Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'") (internal citations omitted). Plaintiff argues that Caddell will be irreparably harmed if the court declines to issue a permanent injunction because "Caddell has lost a valuable business opportunity," as well as the experience of performing this contract, which it could put "toward its future proposals to perform additional Government work." According to plaintiff, "Caddell cannot recover these financial and experiential losses without a permanent injunction." Defendant argues that plaintiff's alleged harm does not amount to an irreparable harm because it is only economic in nature. Defendant cites Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997), for the proposition that "economic harm, without more, does not seem to rise to the level of irreparable injury," and Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573, 582 (2003), for the position that "'[o]nly economic loss that threatens the survival of a movant's business constitutes irreparable harm.'"

Although defendant is correct that some Judges of this court have held that economic harm alone does not constitute irreparable injury, there is also an established line of bid protest decisions holding that the loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and

secure any resulting profits has been recognized to constitute significant harm.”)); Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992) (holding that it is conceivable that plaintiff would be irreparably harmed by the lost opportunity to compete for an award), called into doubt on other grounds by Motorala, Inc. v. United States, 488 F.2d 113 (Fed. Cir. 1993); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828.  A Judge of this court also recently indicated, “[t]he court has repeatedly held that ‘the loss of potential profits’ from a government contract constitutes irreparable harm.”  BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Solutions, LLC v. United States, 102 Fed. Cl. at 696)); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. at 552–53.  The reasoning behind this line of cases is that, in an action at law, the disappointed bidder can only recover bid protest costs, not lost profits, and that would not fully compensate the protestor.  See Serco Inc. v. United States, 81 Fed. Cl. at 501–02 (finding irreparable harm because the only allowed monetary recovery—bid preparation costs—would not fully compensate the plaintiff); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 524 (1991) (noting that the bidder would be irreparably harmed because it “could recover only bid preparation costs, not lost profits, through an action at law”).

Defendant argues that this line of cases is erroneous because it “creates a presumption in favor of injunctive relief, which the Supreme Court held impermissible in eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-93 (2006).”  The court finds no merit in that argument. In eBay, Inc. v. MercExchange, L.L.C., the Supreme Court addressed injunctive relief under the Patent Act.  The United States Supreme Court found that the Federal District Court below had “adopt[ed] certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases.”  Id. at 393. In trying to correct the Federal District Court, the Court of Appeals essentially abandoned the four-factor test for injunctive relief and “articulated a ‘general rule,’ unique to patent disputes, ‘that a permanent injunction will issue’” once two conditions had been met. Id.  The Supreme Court vacated the judgments below, stating: “We hold only that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.”  Id. at 394.  The line of cases in this court that has recognized that lost profits deriving from a lost opportunity to a fair competitive bidding process can constitute irreparable harm does not violate the principle established in eBay, Inc. v. MercExchange, L.L.C., namely that the question of whether to grant equitable relief is in the discretion of the trial court and that “general rules” unique to one category of cases are inappropriate. See id. at 393-94.  Decisions in this court have not indicated that lost profits necessarily constitute irreparable harm.  Rather, individual cases have recognized that, in some circumstances, the loss of a business opportunity, coupled with an unfair procurement process, may result in irreparable harm to a plaintiff. See, e.g., Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744.

In the instant protest, not only would plaintiff stand to lose substantial profits on the contract at issue, but as plaintiff points out, Caddell would lose the experience of

working on a complex design and construction contract abroad, which would make Caddell more competitive for similar contracts in the future. Because without an injunction, plaintiff would suffer a substantial loss of profits resulting from a lost opportunity to compete in a fair and competitive procurement process, as well as the loss of valuable performance experience, the court finds that plaintiff would be irreparably harmed if the court denied the plaintiff's requested injunctive relief.

With regard to the balance of hardships factor, plaintiff argues that the harm to Caddell if injunctive relief were not granted would outweigh the harm to defendant if Desbuild-REC's performance of the Moscow contract were enjoined. Plaintiff asserts that the only potential harm to defendant would be delay and a potential claim for damages by Desbuild-REC under a stop work order. "With respect to the delay that the government states is likely to occur, the Court of Federal Claims has observed that '"only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."'" CW Gov't Travel, Inc. v. United States, 2013 WL 1460458, at *25 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715–16 (2006) (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 399 (1999), appeal dismissed, 6 F. App'x 867 (Fed. Cir 2001), appeal dismissed, 275 F. App'x 968 (Fed. Cir. 2008))). This potential harm would be minimal, plaintiff argues, because Desbuild-REC has not begun performance and, particularly, because any harm to the Department of State was of its own making.

Defendant argues that "permanently enjoining Desbuild-REC from performance of the contract would unnecessarily intrude upon the contracting agency's discretion" and that, because "Caddell has failed to show that DOS acted unreasonably, arbitrarily, or capriciously," the balance of harms favors defendant. Plaintiff has, in fact, established that the Department of State acted in violation of applicable procurement regulations and engaged in arbitrary and capricious conduct during the procurement process for the Moscow contract. The agency also, as demonstrated above, did not record explanations of the actions taken. In fact, the agency conducted the entire procurement in a lax and unacceptable fashion. Plaintiff was prejudiced by defendant's actions. The court, therefore, disagrees that granting injunctive relief under these circumstances would "unnecessarily intrude upon the contracting agency's discretion."

Plaintiff also cites to Sheridan Corp. v. United States, 94 Fed. Cl. 663, in which the defendant argued that an injunction would harm the agency by: 1) delaying performance, and 2) exposing defendant to liability for damages resulting from a stop-work order. See id. at 670. The Sheridan court held that, because the agency had taken an unnecessary corrective action, "these alleged harms are of the agency's own making," and the balance of hardship factor weighed in favor of the plaintiff. Id. Similarly, any harm caused to the Department of State by granting a permanent injunction regarding Desbuild-REC's performance of the Moscow contract is the result of defendant's conduct during the procurement. The balance of harm factor, therefore, weighs in favor of granting injunctive relief.

As to the public interest factor: "'[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'" CW Gov't Travel, Inc. v. United States, 2013 WL 1460458, at *25 (quoting PGBA, LLC v. United States, 57 Fed. Cl. at 663); see also United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.")) (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); PCI/RCI v. United States, 36 Fed. Cl. 761, 776 (1996) ([T]he public interest in protecting the integrity of the procurement system from irrational conduct is served by granting a permanent injunction); see also Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993)); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law.").

Plaintiff argues that the public's interest in "ensuring that procurements are conducted fairly in accordance with the letter and spirit of stated solicitation criteria, laws, and regulations" would be advanced by granting injunctive relief because defendant failed to act in accordance with such requirements in this case. Defendant concedes that "the public interest is served by maintaining the integrity of the procurement system," but, also argues that, "[i]t is equally clear, however, that a procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion." (citing Aero Corp. v. United States, 38 Fed. Cl. 237, 242 (1997)). Plaintiff has established that defendant's contract award violated procurement regulations and involved arbitrary and capricious behavior. The public interest in preserving the integrity of the procurement system, therefore, weighs in favor of granting injunctive relief.

Caddell's ability to receive a fair evaluation by the agency was compromised by the careless and inconsistent evaluation process. While not an exhaustive list, below are some examples of the issues with the Department of State's evaluation of proposals and award of the Moscow contract. With respect to Desbuild's [redacted] percent partnership, the Business Plans submitted by the Joint Venture are inconclusive, but defendant has not documented why it chose to simply accept intervenor's assertions without any discussion internally or further documentation. Defendant also failed to mention that REC submitted three "relevant projects" under Subfactor 2A, Technical Project Experience, when the Pre-qualification Notice clearly instructed joint venture offerors to submit no more than two examples for each joint venture partner. It is, therefore, unclear whether defendant improperly evaluated all three of REC's project examples in determining that the Desbuild-REC Joint Venture had enough combined project experience to pre-qualify and move on to Phase II of the procurement.

Furthermore, Mr. Krips' Recommendation for Contract Award included a number of internal inconsistencies. The Recommendation for Contract Award listed a different number of firms that were pre-qualified for the contract than appeared on FedBizOpps, with the recommendation indicating that five "U.S. Firms" and seven "non-U.S. Firms" that submitted Phase I proposals were pre-qualified for the contract. The April 30, 2012 List of PreQualified Firms-Moscow Annex posted on FedBizOpps, however, indicated that six "U.S. Firms" and nine "Non-U.S. Firms" were pre-qualified. The

Recommendation for Contract Award also listed a different date for when the Solicitation was issued to the pre-qualified firms, with the Recommendation reflecting May 17, 2012, when in fact the Solicitation was issued to the firms on May 18, 2012.

More significantly, the Recommendation for Contract Award is inconsistent in describing the technical merit of plaintiff. Mr. Krips' Recommendation for Contract Award stated that going into the final round, "Caddell's technical proposal receiv[ed] a very slight higher rating," than Desbuild-REC and after the Technical Evaluation Board reviewed the final proposals, "Caddell and Desbuild were rated almost equal." Previously, the Competitive Range Determination determined that Caddell's technical proposal was rated slightly better than Desbuild-REC's. Mr. Krips' Recommendation for Contract Award, however, concluded, "in this instance, the contractor that submitted the highest rated technical proposal also submitted the most reasonable price," even though Caddell's technical proposal was rated slightly higher, or at least equally with, Desbuild-REC's. Similarly, the Technical Evaluation Board acknowledged the plaintiff and Desbuild-REC's proposals were close to equal from a technical standpoint, and stated: "However, after holding discussions with the firms in the competitive range and evaluating the BAFO technical proposals, both firms are rated equally qualified from the technical standpoint."

In addition to the many inconsistencies, the lack of documentation underscores the incompleteness of defendant's evaluation process. Defendant reversed its position regarding Desbuild-REC's pre-qualification status and its qualification for the Percy Amendment price preference. In each instance, the reversal was prompted by a letter from intervenor. Regarding Desbuild-REC's pre-qualification status, Desbuild-REC sent the agency a letter on April 9, 2012, which includes a series of fourteen questions designed to understand how the Department of State made its determinations. Rather than answer the series of involved questions, only four days after the intervenor's letter, Robert Powell, the Contracting Officer, replied to Desbuild-REC, stating: "Upon receipt of your letter dated April 9th, our prequalification panel went through an extensive reevaluation of the package that you have submitted. Following careful consideration, the panel has determined that the Desbuild-REC JV **is** qualified to continue on to the bidding process due to the cumulative experience of the JV members." (emphasis in original). This same letter from Mr. Powell also indicated the Desbuild-REC did not qualify for the Percy Amendment price advantage. Mr. Powell, as noted repeatedly above, never described the "extensive reevaluation" or "careful consideration" the agency, allegedly, had engaged in, and there is no documentation in the record to support any reevaluation or consideration by the agency. In response to Mr. Powell's April 13, 2012 letter, Desbuild-REC pushed back in an April 19, 2012 letter to the agency, arguing that Desbuild-REC should qualify for the Percy Amendment price advantage. As before, only four days after Desbuild-REC's letter was sent, Mr. Powell reversed the previous Percy Amendment decision. Mr. Powell's April 23, 2012 letter reversing the Percy Amendment decision stated in its entirety: "In discussions with OBO's legal advisor and under further review by the pre-qualification panel, we have determined that your Desbuild-REC **is** qualified to receive the price advantage denoted in the Percy Amendment." (emphasis in original). Like the April 13, 2012 response, Mr.

89

Powell, never described the "discussions" or "further review" the agency allegedly had engaged in, and there is no documentation in the record to support any reevaluation or reconsideration by the agency. Rather than demonstrating a deliberative and thorough review, the record suggests that, in each instance when challenged, the Department of State, for reasons of its own, simply relented and allowed Desbuild-REC to proceed.

Finally, the Source Selection Authority offered no analysis or independent judgment in concluding that Desbuild-REC presented the best value to the government, despite the requirement of FAR 15.308. Instead, the only indications that the source selection authority was involved in the decision to award the contract to Desbuild-REC are Mr. Powell's initials and the box checked "Approve," on the same document as Mr. Krips' Recommendation for Contract Award. Indeed, no documents in the record exist between the Recommendation for Contract Award and the signed contract awarded to Desbuild-REC on September 26, 2012. Furthermore, no document exists explaining why Desbuild-REC was selected for the contract award outside of the incomplete, and at times, inaccurate Recommendation for Contract Award. The sum total of inaccurate statements and incomplete reviews demonstrates a failure by the agency to properly evaluate the award of the Moscow contract.

Because plaintiff has demonstrated success on the merits of its bid protest claim and all three other equitable factors weigh in plaintiff's favor, a permanent injunction of Desbuild-REC's performance of the contract for the Moscow project is warranted. Plaintiff, however, is not entitled to bid preparation and proposal costs at this time. In post-award bid protests, injunctive and monetary relief are not necessarily mutually exclusive because the language of 28 U.S.C. § 1491(b)(2) indicates that, "'[t]he courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs' . . . does not explicitly limit a protestor to either injunctive or monetary relief." See Klinge Corp. v. United States, 87 Fed. Cl. 473, 480 (2009) (citing CNA Corp. v. United States, 83 Fed. Cl. 1 (2008) (quoting 28 U.S.C. § 1491(b)(2)), aff'd, 332 F. App'x 638 (Fed. Cir. 2009)); Red River Holdings, LLC v. United States, 87 Fed. Cl. 768, 792 (2009) ("Congress empowered the court with discretion to award equitable and monetary relief . . . ."). The court recognizes, however, that "injunctive relief may often be crafted to provide for the reevaluation of the submitted proposals," which typically, "eliminate[s] the basis for an award of bid preparation and proposals costs." Beta Analytics Int'l, Inc. v. United States, 75 Fed. Cl. 155, 159 (2007); see also Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. 519, 532–33 (2012) (denying bid preparation and proposal costs when a protestor could not show that the costs it had incurred were "rendered unnecessary by the arbitrary, capricious, or otherwise erroneous actions" committed by the agency because the protestor was "unable to receive an award on its earlier proposal"). But see Ala. Aircraft Industries, Inc.–Birmingham v. United States, 85 Fed. Cl. 558, 565 ("Here, without defendant's errors, Alabama Aircraft would have had to submit only one proposal. Due to those errors, Alabama Aircraft is now required to pay for and submit another proposal in a continuing effort to obtain an award of a contract . . . . An award of bid preparation and proposed costs is fully appropriate to provide a complete remedy for Alabama Aircraft."), rev'd on

90

other grounds, 586 F.3d 1372 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010). In the circumstances presented by the above captioned case, the court does not believe that an award of bid preparation and proposal costs is warranted at this time.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the Administrative Record is **GRANTED**. Defendant's and intervenor's cross-motions for judgment on the Administrative Record are **DENIED**. At this time, an award of bid preparation and proposal costs is premature. The Clerk of Court shall enter a permanent injunction and **JUDGMENT** consistent with this opinion.


**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**